Angelese ROBINSON and E. Keith Robinson, Plaintiffs,

v.

The TOWN OF COLONIE; Michael J. Torrey, who at all times mentioned herein was a Town of Colonie Police Officer, individually and in his official capacity; Joseph Valiquette, Jr., who at all times mentioned herein was a Town of Colonie Police Officer, individually and in his official capacity; David Mesick, who at all times mentioned herein was a Town of Colonie Police Officer, individually and in his official capacity; and The TJX Operating Cos., Inc., d/b/a T.J. MAXX, Defendants.

No. 91–CV–1355.

United States District Court, N.D. New York.

March 2, 1995.

Walter, Thayer & Mishler, Albany, NY (Mark S. Mishler, of counsel), for plaintiffs.

Maynard, O'Connor & Smith, Albany, NY (Edwin J. Tobin, Jr., Arete Sprio, of counsel), for defendants Town of Colonie, Michael J. Torrey, Joseph Valiquette, Jr., and David Mesick.

Roche, Corrigan, McCoy & Bush, Albany, NY (Robert P. Roche, of counsel), for defendant TJX Operating Cos., Inc. d/b/a T.J. Maxx.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### INTRODUCTION

Plaintiffs filed this action against TJX Operating Companies, Inc. ("T.J. Maxx") and Police Officers Michael J. Torrey, Joseph Valiquette, Jr., and David Mesick as well as the Town of Colonie (referred to collectively as "the Town Defendants") on November 25, 1991. Plaintiffs subsequently filed an amended complaint and a second amended complaint. Their second amended complaint contains both federal and state causes of action.

The first three causes of action are based upon alleged violations of plaintiffs' federal constitutional and statutory rights. The first of these, brought pursuant to 42 U.S.C. § 1983, alleges that defendants discriminated against them because of their race and color in violation of those rights of plaintiffs which are protected by the First, Fourth, Thirteenth, and Fourteenth Amendments to the United States Constitution. The second alleges that defendants discriminated against plaintiffs on the basis of their race and color in violation of 42 U.S.C. § 1981. Finally, the third alleges that defendants unlawfully conspired to deprive plaintiffs of the equal protection of the laws in violation of 42 U.S.C. § 1985(3).

Plaintiffs' fourth through seventh causes of action are pendent state statutory and common law claims. Their fourth cause of action alleges that defendants discriminated against plaintiffs on the basis of their race and color in a place of public accommodation in violation of New York State Executive Law § 296(2)(a). Their fifth, sixth and seventh causes of action allege various common law tort claims based upon defamation, unlawful imprisonment, and intentional infliction of emotional distress.

Having completed discovery, the Town Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56").[1] Plaintiffs opposed this motion in its entirety and, in addition, cross-moved for partial summary judgment on the issue of the liability of defendant Torrey on their Fourth Amendment and state law false imprisonment claims. The court took these motions under advisement without oral argument. The following constitutes the court's decision with respect to these motions.

### BACKGROUND

The incident which forms the basis of plaintiffs' claims occurred on November 2, 1991, at the T.J. Maxx store in the Town of Colonie. On that date at approximately 5:00 p.m., the Town of Colonie Police dispatcher received a call from Tom Moss, store manager of T.J. Maxx, that three black gentlemen had walked out of the store with a woman's jacket. *See* Sprio Affidavit dated July 2, 1993, at ¶ 6 and Exhibit C attached thereto. At Mr. Moss' request, the dispatcher called for a police unit to respond. *See id.* As a result of this call, a person was handcuffed and arrested for the larceny of a woman's coat. *See id.*

Approximately one hour later, the Town of Colonie Police dispatcher received a call from Susan Miner, Assistant Manager of T.J. Maxx, stating that

[t]he shoplifters are back in. They've been coming up and they open the doors and they walk in and they look at coats and they walk back out and now we just followed two of em' in, a man and a woman, and he put a sweater on and started to leave, but the woman saw watching, a management—.

*See* Sprio Affidavit dated July 2, 1993, at ¶ 7 and Exhibit C attached thereto.

1. By Stipulation dated February 3, 1994, and so ordered by this court on February 15, 1994, plaintiffs discontinued their action against TJX Operating Companies, Inc. with prejudice. *See* Stipulation dated February 3, 1994. Since the Town Defendants have asserted a counterclaim against TJX Operating Companies, Inc., however, T.J. Maxx remains a party to this suit.

The dispatcher told Ms. Miner that he would have a police officer stop by and "take care of these guys." *See id.*

Officer Torrey was the first one to arrive on the scene in response to Ms. Miner's call. *See* Sprio Affidavit at ¶ 8. Upon his arrival, he was referred to Mary Pennant, the supervisor in charge that evening. *See id.* At his deposition, Officer Torrey stated that Ms. Pennant told him that "[s]he had some subjects in the store that she believed were there to shoplift." *See* Torrey Deposition, attached to Sprio Affidavit as Exhibit D ("Torrey Deposition"), at 29. He asked her if anyone had seen these persons shoplift. She responded that "[s]he had an employee that witnessed one of the subjects place a set of socks in his coat and another one of the subjects put a sweater on and walked [sic] into another department, and then took [sic] the sweater off and left [sic] it in that department." *See id.* at 29–30. Officer Torrey spoke to the employee who had seen what allegedly had transpired. This employee told him that the man in the shirt department, Mr. Robinson, was the one who had put the sweater on and then had taken it off in another department. *See id.* at 45–46. None of the T.J. Maxx employees had seen Mrs. Robinson do anything suspicious. *See id.* at 44. Officer Torrey also stated that when he asked Ms. Pennant what she wanted him to do about the situation, she told him that she did not want the suspects arrested but that she wanted them to leave the store. *See id.* at 30.

After requesting backup, Officer Torrey approached the Robinsons who were in the shirt department. *See* Torrey Deposition at 46. Officer Torrey asked plaintiffs to come with him toward the front of the store. *See id.* at 47. The Robinsons asked him what the problem was, to which he responded "The store would like you to go out for the evening." *See id.* Mrs. Robinson asked why, and Officer Torrey stated that "They don't need a reason. If you don't want to leave you will be arrested for trespass." *See id.* at 49; A. Robinson Declaration at ¶¶ 12–13. Plaintiffs then followed Officer Torrey into the vestibule at the front of the store. *See* Torrey Deposition at 50; A. Robinson Declaration at ¶ 17.

Once plaintiffs and Officer Torrey were in the vestibule, they had a further conversation concerning the reason that plaintiffs were being asked to leave. *See* Torrey Deposition at 51. At that time, Officer Torrey told plaintiffs that "[t]he store is asking you to leave, they feel you are here to commit petit larceny and they would like you to leave." *See id.* During this conversation, Mrs. Robinson stated more than once that "[t]he reason you are asking us to leave is because we are black." *See id.* According to Officer Torrey, he advised plaintiffs that that was not the reason. *See id.*

At Mrs. Robinson's request that she be allowed to talk to a supervisor, Officer Torrey went inside the store to get one. *See* Torrey Deposition at 52; A. Robinson Declaration at ¶ 20. Ms. Miner returned to the vestibule with Officer Torrey. Although Officer Torrey does not remember exactly what Ms. Miner said to the Robinsons, plaintiffs state that she told them "There was an earlier incident involving some minorities, and everyone is still very nervous and very upset." *See* Torrey Deposition at 52–53; A. Robinson Declaration at ¶ 24.

At some point in time while plaintiffs and Officer Torrey were in the vestibule, Officers Mesick and Valiquette arrived separately. When Officer Mesick arrived, Mrs. Robinson asked him why plaintiffs were being asked to leave. *See* Mesick Deposition, attached as Exhibit E to Sprio Affidavit ("Mesick Deposition"), at 23. He told her that he did not know but that he would go inside and ask. *See id.* at 22. Officer Mesick spoke to a management person who told him that a security employee thought Mr. Robinson had picked up a couple of pairs of socks and attempted to conceal them in his coat and then had gone into another part of the store. *See id.* at 24. Since the security employee thought Mr. Robinson might have been attempting to shoplift, the store was asking plaintiffs to leave. *See id.*

Officer Mesick returned to the vestibule and told plaintiffs what he had learned. *See* Mesick Deposition at 25. At his deposition, Officer Mesick stated that he told plaintiffs that the police were not forcing them to leave the store but were asking them to cooperate

with the store's request. *See id.* at 26. He also told plaintiffs that if they believed that their rights were being violated they should contact the store on Monday and talk to management. *See id.* at 26; A. Robinson Declaration at ¶ 39.

Officer Mesick then asked the Robinsons for their driver's licenses. *See* Mesick Deposition at 26; A. Robinson Declaration at ¶ 21. He then had Officer Torrey radio plaintiffs' names and dates of birth to the dispatcher. *See* Mesick Deposition at 27; Torrey Deposition at 55; A. Robinson Declaration at ¶ 28. Both Officer Torrey and Officer Mesick stated that this was standard procedure when the police confronted someone in any kind of incident. *See* Mesick Deposition at 27; Torrey Deposition at 56. Officer Mesick also told plaintiffs that here had been an earlier incident involving a black person who had been arrested for shoplifting and that the people inside the store felt that plaintiffs might have been involved with the earlier group. *See* Mesick Deposition at 29. He also stated that this might be the reason the store was asking plaintiffs to leave. *See id.;* A. Robinson Declaration at ¶ 38. According to plaintiffs, Officer Mesick also told them that "[p]erhaps [Mrs. Robinson] needs to find another place to shop. They don't want you in here." *See* A. Robinson Declaration at ¶ 33.

After Officer Torrey returned plaintiffs' driver's licenses to them, Mrs. Robinson asked for the store manager's name. *See* Torrey Deposition at 61. Officer Torrey went into the store and asked Ms. Pennant for her name, address, and telephone number. *See id.* He returned to the vestibule and gave Mrs. Robinson this information. *See id.* Mrs. Robinson then asked for the assistant manager's name. *See id.* at 62. Officer Torrey went into the store and asked Ms. Miner for this information. *See id.* When he returned to the vestibule, plaintiffs were no longer there.[2] *See id.*

When Officer Valiquette arrived at the store, plaintiffs, Officer Torrey and Officer Mesick were in the vestibule. He heard Officer Torrey explain to plaintiffs that they were being asked to leave because an employee had seen Mr. Robinson put a pair, or several pairs, of socks underneath his coat. *See* Valiquette Deposition at 32. He also heard plaintiffs deny that the incident had occurred. *See id.* While Officer Torrey was in the store getting the name of the employee who had seen what allegedly had occurred, Officer Valiquette believed that things were getting heated because someone had mentioned that the reason plaintiffs were being asked to leave was because they were black. In response, Officer Valiquette said, "I hope in this day and age no one is going to ask someone to leave a store because they are black. That's ridiculous. Personally, if that was [sic] the case I would have been the first one to leave the store." *See id.* at 35.

After plaintiffs left T.J. Maxx, they got into their car and drove to a telephone booth from which Mrs. Robinson called the local television stations and told them about the incident. *See* Robinson Deposition, attached as Exhibit B to D'Agostino Affidavit ("Robinson Deposition"), at 60. The Robinsons then returned home where they made several telephone calls to tell people how they had been treated. *See id.* at 62. Mr. Robinson called Mr. Flowers, who had been at T.J. Maxx at the time of the incident and who had handed Mr. Robinson his telephone number. *See id.* at 56, 67. The next day, Mr. Flowers returned the call and asked if he could give plaintiffs' names to a friend of his, Al Conyers, who worked at the NAACP. *See id.* at 68. Plaintiffs met with Mr. Conyers on the Monday following the incident. *See id.* at 71. Mr. Conyers wanted to arrange a meeting with T.J. Maxx. *See id.* On the following Friday, plaintiffs, together with the NAACP, held a press conference in front of T.J. Maxx. *See id.* at 75. In addition, they asked T.J. Maxx to remove the store's management and to put its employees through sensitivity training. *See id.* at 84. On November 25, 1991, plaintiffs filed the instant action.

---

**2.** At his deposition, Officer Valiquette stated that it was Officer Mesick, rather than Officer Torrey, who went into the store to get the manager's name for plaintiffs. *See* Valiquette Deposition, attached as Exhibit F to Sprio Affidavit ("Valiquette Deposition"), at 36–37.

394

## DISCUSSION

### I. Summary Judgment Standard

The court may not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party seeking summary judgment bears the burden of demonstrating that no genuine factual issue exists. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223–24 (2d Cir.1994). In making its determination as to whether any genuine factual dispute exists, the court must resolve all ambiguities in favor of the nonmovant. *See Cronin*, 46 F.3d at 202 (citations omitted). Moreover, the court must view the inferences to be drawn from the underlying admissions, affidavits, exhibits, interrogatory answers, and depositions in the light most favorable to the nonmoving party. *See id.* (citations omitted).

■ The court may grant summary judgment if the movant shows that little or no evidence may be found to support the nonmovant's case. *See Gallo*, 22 F.3d at 1223. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Id.* at 1224 (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)). Finally, the court must keep in mind that its "[t]ask at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding, it does not extend to issue-resolution." *Id.* at 1224; *see also Cronin*, 46 F.3d at 203.

It is with these guidelines in mind that the court must determine whether the parties are entitled to the relief they seek with respect to any of plaintiffs' causes of action.

### II. Federal Causes of Action

#### A. Plaintiffs' First Cause of Action—42 U.S.C. § 1983 [3]

■ As the Second Circuit recently stated "[s]ection 1983 provides an instrument by which an individual deprived of a federal right by a person acting under color of state law may be compensated." *Eagleston v. Guido*, 41 F.3d 865, 875 (2d Cir.1994) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981)). As the *Eagleston* court noted,

[i]t is well established that in order to state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States.

*Id.* at 875–76 (quoting *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir.1993)); *see also Flowers v. The TJX Companies, Inc.*, No. 91–CV–1339, slip op. at 7, 1994 WL 382515, at *3 (N.D.N.Y. July 15, 1994) (Munson, S.J.).

Moreover, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of*

3. Section 1983 provides, in pertinent part, that Every person who, under color of statute, ordinance, regulation, custom, or usage, of any State ..., subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.

*Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)) (other citations omitted).

In the present case, there is no dispute that the police officers were acting under color of state law. What is disputed, however, is whether these officers deprived plaintiffs of any federal rights and, if such deprivation did occur, whether these officers are shielded from suit by the doctrine of qualified immunity. Since plaintiffs allege that defendants violated several of their federal rights, the court will discuss each of their claims *seriatim.*

### 1. First Amendment—Freedom of Association

The Supreme Court's decisions in the First Amendment area have referred to "freedom of association" in two distinct senses. *See Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State ... In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Id.* at 617–18, 104 S.Ct. at 3249, 82 L.Ed.2d at 470.

In support of their motion, the Town Defendants assert, first of all, that there is no protection under the First Amendment for unlawful or suspected unlawful activity such as shoplifting. *See* Town Defendants' Memorandum of Law at 14. Moreover, the Town Defendants argue that there is no common interest of membership at issue here nor any interference with plaintiffs' choice to enter into any intimate or private relationship. *See id.*

■ To the contrary, plaintiffs contend that the Town Defendants restrained plaintiffs' first amendment right to associate with and speak to those with whom they wanted to communicate. *See* Plaintiffs' Memorandum of Law at 26. Specifically, plaintiffs assert that by forcibly detaining them in the vestibule defendants prevented them from communicating and socializing with other shoppers. *See id.* In addition, plaintiffs aver that although they made clear their desire to voice their complaint to store management, the police officers prevented them from remaining in the store and forced them to leave and register their complaint on another day. *See id.;* A. Robinson Declaration at ¶¶ 15, 39.

Even assuming that the Town Defendants did interfere with plaintiffs' right to associate with other shoppers and to voice their complaint to store management, these are not the types of "relationships" which the First Amendment seeks to protect. Thus, the court concludes that plaintiffs have failed to produce any evidence which would support a claim that the Town Defendants violated plaintiffs' First Amendment right to freedom of association. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' first cause of action to the extent that it rests upon the First Amendment.

### 2. Thirteenth Amendment—Badges and Incidents of Slavery

The Thirteenth Amendment to the United States Constitution provides that

> Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

> Section 2. Congress shall have power to enforce this article by appropriate legislation.

U.S. Const., amend. 13.

■ In support of their motion, the Town Defendants argue that their removal of plaintiffs from the store does not violate the Thirteenth Amendment's prohibition against involuntary servitude. *See* Town Defendants' Memorandum of Law at 18. In response, plaintiffs assert that the Town Defendants'

behavior toward them subjected them to the "badges and incidents" of slavery in violation of the Thirteenth Amendment. *See* Plaintiffs' Memorandum of Law at 20. In support of this contention, plaintiffs argue that "[n]one of the defendant officers ever stopped or questioned [them] about any particular conduct in the retail store. Instead, based solely on the color of their skin, defendants [sic] police officers unquestioningly accepted the alleged association of the Robinsons with an earlier shoplifter." *See id.* (citing Mesick statement [Exhibit L]). Moreover, plaintiffs contend that one of the officers told plaintiffs that they were not welcome in the store. *See id.* at 21 (citing A. Robinson Declaration at ¶ 33).

■ The Town Defendants are correct that their actions cannot be construed as subjecting plaintiffs to involuntary servitude. This fact alone, however, does not shield them from liability under the Thirteenth Amendment. "The Thirteenth Amendment not only prohibits slavery and involuntary servitude, but also gives Congress the power to prohibit actions that impose a 'badge of slavery' on citizens." [4] *Hawk v. Perillo,* 642 F.Supp. 380, 384 (N.D.Ill.1985) (citing *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 439–43, 88 S.Ct. 2186, 2203–05, 20 L.Ed.2d 1189 (1968). *But see City of Memphis v. Greene,* 451 U.S. 100, 126 n. 40, 101 S.Ct. 1584, 1599 n. 40, 67 L.Ed.2d 769 (1981)). The court went on to explain, "[h]owever, [that] in the realm of equal protection, the Thirteenth Amendment offers no protection not already provided under the Fourteenth Amendment." *Id.* (citation omitted).

■ In the present case, it is difficult to determine from the face of plaintiffs' complaint exactly what the basis for their Thirteenth Amendment claim is. In view of their arguments in opposition to this motion, however, it appears that the gravamen of their claim is that the Town Defendants treated them differently because of their race/color. Viewed in these terms, plaintiffs' claim is a classic example of a Fourteenth Amendment equal protection claim. Since plaintiffs assert such a claim as part of their first cause of action, the court finds their Thirteenth Amendment claim to be redundant. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' first cause of action to the extent that it rests upon the Thirteenth Amendment.

### 3. Fourth Amendment—Unreasonable Seizures [5]

■ In order to determine whether an individual's Fourth Amendment rights have been violated, the court must engage in a two-part analysis: (1) under all the circumstances of the case, did the encounter between the individual and the police officer constitute a "seizure" within the meaning of the Fourth Amendment; and (2) if said encounter did constitute a seizure, was such seizure reasonable. In the present case, neither party addressed the first prong of this test. The Town Defendants apparently concede, at least for purposes of this motion, that their encounter with the Robinsons constituted a seizure. Thus, their analysis of the situation focuses entirely upon the reasonableness of the encounter. Obviously, seeing no reason to disturb the Town Defendants' concession, plaintiffs' argument, likewise, addresses only the second prong of this test. Despite the foregoing concession, however, the question of whether a seizure has occurred is a matter of law in the first instance. *See United States v. Springer,* 946 F.2d 1012, 1015 (2d Cir.1991) (citations omitted). Consequently, the court has an independent obligation to address this issue.

■ In order to place the present case in the proper perspective, it is necessary for the court to review, in some detail, the Supreme

---

4. In an exercise of the power conferred upon it by § 2 of the Thirteenth Amendment, Congress enacted 42 U.S.C. § 1981.

5. The Fourth Amendment provides that
 [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.
 U.S. Const. amend. 4.

Court's development of Fourth Amendment jurisprudence. Beginning with its decision in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court has sought to refine its definition of "seizure" for purposes of the Fourth Amendment. In *Mendenhall,* the encounter at issue occurred in an airport concourse. Agents from the Drug Enforcement Agency ("DEA") approached a young woman, fitting the drug courier profile, as she walked through the concourse, identified themselves as federal agents, and asked to see her identification and airline ticket. In response, she produced her driver's license and her ticket, each of which bore a different name. After reviewing these documents, the DEA agents returned them to Ms. Mendenhall and asked her to accompany them to the airport's DEA office for further questioning. Although she did so, there was nothing in the record to indicate that she verbally agreed to this request. The DEA's office, comprised of a reception area and three adjoining rooms, was situated approximately 50 feet from where the agents originally had encountered Ms. Mendenhall. Once in the office, the agents asked for consent to search her person and her handbag. Although they informed her that she had a right to decline their request, she, nonetheless, agreed to the search.

The Court began its analysis of these facts by indicating that in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court had " 'assume[d] that up to th[e] point [at which the officer physically restrained Terry for purposes of searching his person for weapons] no intrusion upon constitutionally protected rights had occurred.' " *Mendenhall,* 446 U.S. at 552–53, 100 S.Ct. at 1876, 64 L.Ed.2d at 508 (quoting [*Terry v. Ohio,* 392 U.S.,] at 19, n. 16, 88 S.Ct., at 1879, n. 16). The Court went on to say that this "[a]ssumption appear[ed] entirely correct in view of the fact noted in White's concurring opinion that '[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the street.' " *Id.,* 446 U.S. at 553, 100 S.Ct. at 1876, 64

L.Ed.2d at 508 (quoting [*Terry*], 392 U.S., at 34, 88 S.Ct., at 1886). Based upon these legal principles, the Court concluded that a "[p]erson has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.,* 446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.[6]

The Court went on to list several factors which might indicate a seizure, even in those instances in which a person did not attempt to leave: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509 (citations omitted). The Court then concluded that "[i]n the absence of some such evidence, otherwise inoffensive conduct between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 555, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.

Applying this law to the facts of the case before it, the Court held that no seizure had occurred. In support of this conclusion, the Court noted that (1) the events had taken place in a public concourse; (2) the agents neither wore uniforms nor displayed their guns; (3) the agents did not summon Ms. Mendenhall to their presence, instead they approached her and identified themselves; and (4) the agents requested, but did not demand, to see her identification and ticket. Moreover, the Court explained that Ms. Mendenhall "[w]as not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official." *Id.* at 555, 100 S.Ct. at 1877, 64 L.Ed.2d at

---

6. The Court noted that the subjective intent of the agents to detain Ms. Mendenhall, had she attempted to leave, was irrelevant except insofar as it may have been conveyed to her. *Id.* at 554 n. 6, 100 S.Ct. at 1877 n. 6, 64 L.Ed.2d at 509.

509.[7]

In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), another airport encounter between law enforcement officials and an individual fitting the drug courier profile, the Court concluded that a seizure had occurred. In doing so, however, the Court reiterated that police officers do not violate the Fourth Amendment merely by approaching an individual in a public place, by asking her if she is willing to answer questions, and by putting questions to her if she is willing to listen. *Royer,* 460 U.S. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236. Moreover, the Court found that the officer's request for and examination of Mr. Royer's ticket and driver's license were permissible actions that, standing alone, did not convert the encounter into a seizure. *Id.* at 501, 103 S.Ct. at 1326, 75 L.Ed.2d at 238. Rather, it was only when the agents identified themselves, told Mr. Royer that they suspected him of transporting narcotics, and asked him to accompany them to a police room, while at the same time retaining his ticket and driver's license and failing to indicate that he was free to leave, that the initial encounter was converted into a seizure. *Id.* at 501, 103 S.Ct. at 1326, 75 L.Ed.2d at 238. After viewing the agents' conduct in its entirety, the Court concluded that "[t]hese circumstances surely amount to a show of official authority such that 'a reasonable person would have believed that he was not free to leave.'" *Id.* at 501–02, 103 S.Ct. at 1326, 75 L.Ed.2d at 238 (quoting *United States v. Mendenhall,* 446 U.S., at 554, 100 S.Ct., at 1877 (opinion of Stewart, J.) (footnoted omitted)).

In *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), the Court applied the principles set forth in *Mendenhall* and *Royer* to an entirely different setting—factory surveys conducted by the INS in search of illegal aliens.[8] As set forth by the Court, the following facts describe the setting in which the challenged encounters occurred:

At the beginning of the surveys several agents positioned themselves near the buildings' exits, while other agents dispersed throughout the factory to question most, but not all, employees at their work stations. The agents displayed badges, carried walkie-talkies, and were armed, although at no point during any of the surveys was a weapon ever drawn. Moving systematically through the factory, the agents approached employees and, after identifying themselves, asked them from one to three questions relating to their citizenship. If the employee gave a credible reply that he was a United States citizen, the questioning ended, and the agent moved on to another employee. If the employee gave an unsatisfactory response or admitted that he was an alien, the employee was asked to produce his immigration papers. During the survey, employees continued with their work and were free to walk around within the factory.

*Delgado,* 466 U.S. at 212–13, 104 S.Ct. at 1760–61, 80 L.Ed.2d at 252–54.

The Court began its analysis by stating that the Court's decision in *Royer* implied that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762, 80 L.Ed.2d at 254. In addition, the Court stated that

what is apparent from *Royer* and *Brown* is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual

---

7. The Court also noted that its conclusion that no seizure had occurred was not affected by the fact that the agents did not expressly tell Ms. Mendenhall that she was free to decline to cooperate with their inquiry. *Id.* at 555, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. In this regard, the Court stated that the voluntariness of Ms. Mendenhall's responses did not depend upon her having been so informed. *Id.*

8. These surveys were conducted pursuant to warrants issued on a showing of probable cause that numerous illegal aliens were employed at the factories. The warrants, however, did not identify any particular illegal alien by name. *See Delgado,* 466 U.S. at 212, 104 S.Ct. at 1760.

nature of the response. (citation omitted). Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the persons [sic] refuses to answer and the police take additional steps—such as those taken in *Brown*—to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure.

*Delgado,* 466 U.S. at 216–17, 104 S.Ct. at 1762–63, 80 L.Ed.2d at 254–57 (citations omitted).[9]

Applying this law to the facts before it, the Court held that no seizure had occurred in spite of the fact that agents were stationed at the doors and the surveys prompted some of the employees to attempt to hide from the agents. In support of this conclusion, the Court noted that during the surveys the employees went about their ordinary business; the agents did not prevent the employees from moving about the factory; and the questioning was nothing more than a brief encounter.

In *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), the Court acknowledged that the test for determining when an encounter becomes a seizure is imprecise "[b]ecause it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Id.* at 573, 108 S.Ct. at 1979, 100 L.Ed.2d at 571. Moreover, the Court explained that its "reasonable person" standard "[e]nsures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." *Id.* at 574, 108 S.Ct. at 1980, 100 L.Ed.2d at 572.

In *Chesternut,* four officers in a patrol car observed an individual approach Mr. Chest-

ernut who was standing on a street corner. When Mr. Chesternut saw the patrol car, he turned and began to run. The officers drove their car around the corner, following Mr. Chesternut to see where he was going. They caught up to him and drove alongside him for a short distance. As they drove beside him, they saw Mr. Chesternut discard a number of packets. One of the officers alighted from the car, examined the packets, and determined that they contained pills. While the officer examined the packets, Mr. Chesternut ran a few paces farther and then stopped. At that point, the officer arrested him. Based upon these facts, the Court concluded that Mr. Chesternut was not seized by the police before he discarded the packets. The Court noted that until that time, the officers had not activated the patrol car's siren or flashers, had not commanded Mr. Chesternut to halt, had not displayed their weapons, and had not operated their patrol car in an aggressive manner to block Mr. Chesternut's course or to control his direction or speed of movement. *Id.* at 574, 108 S.Ct. at 1980, 100 L.Ed.2d at 572. Although the Court acknowledged that the presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, the Court, nonetheless, concluded that this kind of police pressure did not, standing alone, constitute a seizure. The Court explained that

> [w]ithout more, the police conduct here—a brief acceleration to catch up with [Mr. Chesternut], followed by a short drive alongside him—was not "so intimidating" that [Mr. Chesternut] could reasonably have believed that he was not free to disregard the police and go about his business. *INS v. Delgado,* 466 U.S., at 216, 104 S.Ct., at 1762–63. The police therefore were not required to have "a particularized and objective basis for suspecting [Mr. Chesternut] of criminal activity," in order to pursue him. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–695, 66 L.Ed.2d 621 (1981).

---

**9.** In *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), two policemen physically detained Mr. Brown to determine his identity after he refused the officers' request to identify himself. The Court found that absent a reason-able suspicion that Mr. Brown was engaged in some type of misconduct, the officers' conduct violated Mr. Brown's Fourth Amendment right to be free from an unreasonable seizure. *Id.* at 52, 99 S.Ct. at 2641, 61 L.Ed.2d at 362.

**400**

*Id.,* 486 U.S. at 576, 108 S.Ct. at 1981, 100 L.Ed.2d at 573.

■ Most recently in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Court summarized the types of conduct that it had previously concluded would not convert an officer's encounter with an individual into a seizure for purposes of the Fourth Amendment. In this regard, the Court stated that

[e]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, *see INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984);

*[Florida v.] Rodriguez,* 469 U.S. [1], at 5–6, 105 S.Ct. [308], at 310–311 [83 L.Ed.2d 165]; ask to examine the individual's identification, *see Delgado,* 466 U.S., at 216, 104 S.Ct., at 1762; *Royer,* 460 U.S., at 501, 103 S.Ct., at 1326 (plurality opinion); *United States v. Mendenhall,* 446 U.S. 544, 557–558, 100 S.Ct. 1870, 1878–1879, 64 L.Ed.2d 497 (1980), and request consent to search his or her luggage, *see Royer,* 460 U.S., at 501, 103 S.Ct., at 1326 (plurality opinion)— as long as the police do not convey a message that compliance with their requests is required.

*Id.* at 434, 111 S.Ct. at 2386, 115 L.Ed.2d at 398.[10]

**10.** Following the Supreme Court's lead, the Second Circuit, in recent years, has had a number of opportunities to address the issue of whether or not a particular encounter rises to the level of a seizure entitled to Fourth Amendment protection. In doing so, the Second Circuit has identified three types of encounters between police officers and individuals. In the first instance, the individual agrees to speak with the officers absent any duress or coercion. This type of encounter does not implicate the Fourth Amendment. *United States v. Hooper,* 935 F.2d 484, 490 (2d Cir.), *cert. denied,* 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). The second type of encounter involves the limited detention of an individual based upon the officer's reasonable suspicion that criminal activity is underway. *Id.* The third type of incident involves an arrest based upon probable cause that a crime has been committed. *Id.* Both of these latter types of incidents constitute seizures within the meaning of the Fourth Amendment. *Id.*

Using this general framework as a guide, the Second Circuit has analyzed a number of different factual scenarios to determine whether and/or when an encounter becomes a seizure. *See, e.g. United States v. Hooper,* 935 F.2d 484 (2d Cir.), *cert. denied,* 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991) **(facts:** officers briefly questioned Mr. Hooper, seized his suitcase pending application for a search warrant, conducted an investigation lasting less than 30 minutes, and obtained a search warrant approximately 23 hours later; **holding:** no seizure—no threat or use of physical force to restrain Mr. Hooper; Mr. Hooper voluntarily agreed to speak with agents; agents were courteous and did not display weapons); *United States v. Springer,* 946 F.2d 1012 (2d Cir.1991) **(facts:** officer followed Mr. Springer and approached him as he stood at taxi stand outside bus terminal; officer identified himself, displayed his badge and asked if he could speak to Mr. Springer; Mr. Springer agreed; agent asked Mr. Springer to step away from the curb to get away from moving traffic, to which Mr. Sprinter agreed; agent asked Mr. Springer for identification and why he had come to Buffalo;

**holding:** no seizure—only single officer approached Mr. Springer; agent in plain clothes and did not display weapon; no show of force; agent did not physically touch Mr. Springer; conversation between agent and Mr. Springer neither intimidating nor coercive); *United States v. Torres,* 949 F.2d 606 (2d Cir.1991) (same); *United States v. Glover,* 957 F.2d 1004 (2d Cir. 1992) **(facts:** single officer approached Mr. Glover in public area; officer identified himself and in non-threatening manner asked Mr. Glover questions, requested some form of identification, and asked Mr. Glover if he would consent to a search; no weapons displayed; no physical contact; without returning identification, officer asked Mr. Glover to leave public area and go to security office for further questions; **holding:** no seizure until officer requested that Mr. Glover leave public area and go with him to security office for further questions without returning his identification and without telling him that he was free to leave—only at that point would a reasonable person have believed that he was not free to leave).

Even prior to developing the guidelines set forth in *Hooper,* the Second Circuit had occasion to address the issue of whether an encounter in a public area between an individual and four police officers constituted a seizure. *See United States v. Lee,* 916 F.2d 814 (2d Cir.1990). In *Lee,* two of the four officers present approached and questioned Mr. Lee. The officers were not in uniform and did not display their weapons. There was no show of force or physical touching nor was Mr. Lee's freedom in any way limited or his movement impeded. Although the officers asked Mr. Lee for his identification and tickets, after examining them, the officers promptly returned the documents to Mr. Lee. Finally, the officers' suggestion that they conduct the interview in the terminal rather than in the exit was nonconfrontational. The court noted that the officer's statement to Mr. Lee that he was suspected of carrying contraband could be construed to imply that Mr. Lee was not free to leave. The court, however, was not convinced that this single statement was sufficient to con-

In applying the above-cited legal principles to the facts of the present case, the court accepts as uncontroverted plaintiffs' version of their encounter with the police officers. Plaintiffs' initial encounter with the officers occurred when Officer Torrey, uniformed and armed, approached plaintiffs in the shirt department. *See* A. Robinson Declaration at ¶¶ 8–9. Officer Torrey asked plaintiffs to come with him. *See id.* at ¶ 10. When plaintiffs asked why, Officer Torrey responded "[b]ecause I'm telling you to." *See id.* He then told plaintiffs that the store manager had called the police and asked them to remove plaintiffs from the store. *See id.* at ¶ 11. When Mrs. Robinson asked him why, Officer Torrey responded "They don't need a reason ... this is private property and they have a right to ask you to leave whenever they want to." *See id.* at ¶ 12. Officer Torrey then told plaintiffs "If you don't leave, I will arrest you for trespassing." *See id.* at ¶ 13. At this point, Mrs. Robinson asked to speak to the store manager. *See id.* at ¶ 15. Officer Torrey told her that if she wanted to speak to the manager, she would have to accompany him to the vestibule. *See id.*

The Robinsons followed Officer Torrey to the vestibule. *See* A. Robinson Declaration at ¶ 17. When they entered the vestibule, Officers Valiquette and Mesick arrived and stopped in front of them. *See id.* at ¶ 19. Officer Mesick asked to see plaintiffs' driver's licenses and told plaintiffs to remove the licenses from their wallets. *See id.* at ¶ 21. Officer Mesick handed the licenses to Officer Torrey and told him to call plaintiffs in to the dispatcher and Officer Torrey did so, while remaining in the vestibule. *See id.* at ¶ 28. Officer Mesick also questioned plaintiffs about whether they were with or knew the people involved in an earlier incident. *See id.* at ¶ 29–30. Officer Torrey returned with plaintiffs' licenses and told the other officers that there were no reports on plaintiffs. *See id.* at ¶ 35. Mrs. Robinson reached out for the licenses; but before handing them to her, Officer Torrey asked for plaintiffs' telephone number. *See id.* at ¶ 36. Officer Mesick told

plaintiffs that they were not being accused of anything but that they had to leave the store. *See id.* at ¶ 37. Officer Torrey returned plaintiffs' driver's licenses to them, and plaintiffs left the store. *See id.* at ¶ 40.

Viewing these facts in their entirety and drawing all reasonable inferences therefrom in favor of plaintiffs, the court concludes that, as a matter of law, the encounter at issue in the present case does not constitute a seizure within the meaning of the Fourth Amendment. First of all, the initial encounter involved only one officer who neither displayed his weapon, threatened to use or used force on plaintiffs, nor touched plaintiffs in any way. Although he asked plaintiffs to accompany him and told plaintiffs that the store wanted them to leave, he never blocked their movement or prevented plaintiffs from leaving the store without him. Moreover, there is no indication in the record that plaintiffs refused Officer Torrey's request.

Although plaintiffs stopped in the vestibule and continued their conversation with the officers, there is no evidence that plaintiffs were not free to leave the store immediately. To the contrary, it appears that plaintiffs remained in the vestibule, at least in part, because they wanted to speak to the store manager before they left. Furthermore, Officer Mesick's request to see plaintiffs' driver's licenses did not convert this otherwise consensual encounter into a seizure. There is nothing in the record to indicate that plaintiffs refused his request or that Officer Mesick in any way coerced their consent. Moreover, Officer Torrey did not leave the vestibule with plaintiffs' driver's licenses. Rather, he relayed the information to the dispatcher over a portable radio in full view of plaintiffs. Once he was finished and the officers asked plaintiffs for their telephone number, he returned plaintiffs' licenses to them. Perhaps most significantly, there is no evidence to support a finding that at any time during this encounter any of the officers prevented plaintiffs from leaving the store. In fact, once their licenses were returned,

vert an otherwise consensual encounter into a Fourth Amendment seizure. *See Lee,* 916 F.2d at 819. Based upon the totality of these circumstances, the court held that the officer's conduct

was not unduly coercive and, thus, the encounter did not amount to a seizure within the meaning of the Fourth Amendment. *See id.*

plaintiffs did leave the store without any attempt on the part of the officers to stop them.

The court's conclusion that as a matter of law no seizure has occurred under the particular facts of this case is further supported by the Second Circuit's recent decision in *Sheppard v. Beerman*, 18 F.3d 147 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994). In that case, the plaintiff, a former law clerk of the defendant state judge, claimed, among other things, that he had been seized by court officers who had escorted him from the courthouse after he and Judge Beerman became embroiled in an argument. Although Mr. Sheppard worked for the remainder of the day on which the argument occurred, when he next returned to work he was removed from the judge's chambers by court officers who informed him that Judge Beerman had fired him. The officers forced Mr. Sheppard to leave immediately and did not allow him to take his belongings with him. Mr. Sheppard claimed that this incident constituted an unlawful seizure of his person. The district court disagreed, finding that his liberty had never been restrained. *See id.* at 153. The Second Circuit affirmed, finding that

> [i]n the present case, as correctly noted by the district court, Sheppard was "free to go anywhere else that he desired," with the exception of Beerman's chambers and the court house. · Had Beerman retained Sheppard's car keys or his wallet, then perhaps Sheppard arguably could have been seized, because it would have prevented him from being "free to leave." (citation omitted). Because there are no such allegations in Sheppard's complaint, Sheppard has failed to state a claim that his person was seized.

*Id.*

Like Mr. Sheppard, the Robinsons were always free to go anywhere they wanted as long as they did not remain in the store. Under such circumstances, *Sheppard* dictates a finding that no "seizure" occurred. Accordingly, for all the reasons stated above, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' first cause of action to the extent it rests upon the Fourth Amendment.

### 4. *Fourteenth Amendment—Equal Protection*

■■■■ The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall ... deny any person within its jurisdiction the **equal protection of the laws.**" U.S. Const., amend. 14, § 1 (emphasis added). "To state an equal protection claim, a § 1983 plaintiff must allege that a state actor purposefully discriminated against him because of his identification with a particular (presumably historically disadvantaged) group." *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1220 (7th Cir.1994) (citing *Shango v. Jurich*, 681 F.2d 1091, 1103–04 (7th Cir.1982); *Washington v. Davis*, 426 U.S. 229, 247–48, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976)); *see also Prompt Courier Serv., Inc v. Koch*, No. 89 Civ. 3053, 1990 WL 100904, at *4, 1990 U.S.Dist. LEXIS 8628, at *26 (S.D.N.Y. July 12, 1990). It is not necessary, however, that a plaintiff prove that the challenged action rested **solely** upon racially discriminatory purposes; only that the discriminatory purpose was **a motivating factor** in the decision. *See Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450, 464–66 (1977). A plaintiff may satisfy this evidentiary burden "[e]ither by introducing facts establishing that discriminatory racial intent was the most likely motivation for the action in question, or that the defendant's alternative explanation for [its] action is impossible." *Prompt Courier Serv., Inc.*, 1990 WL 100904, at *8, 1990 U.S.Dist. LEXIS 8628, at *25 (citing *Gibson v. American Broadcasting Companies, Inc.*, 892 F.2d 1128, 1132 (2d Cir.1989) (discussing Title VII and § 1981 claims in the context of a summary judgment motion)); *see also Jennings v. Lewis*, No. 93–15674, 1993 WL 524130, 1993 U.S.App. LEXIS 34219 (9th Cir. Dec. 6, 1993) (discriminatory intent may be proven by direct or circumstantial evidence).

■■■ To support their claim that the officers' conduct toward them was motivated, at

least in part, by racially discriminatory animus, the Robinsons argue that

1. for no stated reason, the Robinsons were associated with an earlier shoplifting incident. The only thing common to the Robinsons and the individual arrested earlier was their race.

2. Officer Mesick told Mrs. Robinson that she should find another place to shop because "they don't want you in here," even though she was not observed doing anything suspicious in the store. *See* A. Robinson Declaration at ¶ 33.

3. All the police officers were present in the vestibule when Ms. Miner explained to the Robinsons that they were being asked to leave due to "an earlier incident involving some minorities." *See id.* at ¶ 26.

4. The officers explained to the Robinsons that the reason they were being asked to leave involved the store's suspicion of the Robinsons for shoplifting due to an earlier incident. *See id.* at ¶ 38; Mesick Deposition at 29.

5. The police officers questioned the Robinsons repeatedly about any possible association with those involved in the earlier incident while at the same time assuring the Robinsons that they were not being accused of anything. *See* A. Robinson Declaration at ¶¶ 29–32, 37.

6. Officer Mesick acknowledged that he told the Robinsons that their alleged association with the earlier group might be the reason they were being asked to leave the store. *See* Mesick Deposition at 29–30.

To the contrary, the Town Defendants assert that the officers asked the Robinsons to leave solely because the store suspected them of shoplifting. To support this contention, the Town Defendants direct the court's attention to the fact that at their depositions, plaintiffs stated that they saw no other African–Americans denied entry to the store. *See* Town Defendants' Reply Memorandum of Law at 9 (citing Robinson Deposition at 124). Moreover, plaintiffs stated that although other African–American customers were present in the store, none of them were either approached or asked to leave. *See* Robinson Deposition at 147–48. According to the Town Defendants, these facts, belie a finding that the police officers' conduct toward plaintiffs was motivated by discriminatory animus. *See* Town Defendants' Reply Memorandum of Law at 10. Had such animus existed, assert the Town Defendants, there is no explanation as to why no other African–American customers were approached, questioned or requested to leave.

What makes the present case problematic is the difficulty in defining the exact contours of plaintiffs' equal protection claim and separating the actions of the T.J. Maxx employees from those of the Town Defendants.[11] In the broad sense, of course, they allege, and seek to prove, that the officers treated them differently because they are African–American. In this regard, plaintiffs deny that they were shoplifting and argue that the store only suspected them of shoplifting because of an earlier incident which involved an African–American. Certainly, there is evidence in the record that arguably would support this contention. For purposes of this motion, however, the question remains whether plaintiffs' allegations support a finding of racial animus on the part of the Town Defendants.

At the time that Officer Torrey received the call from the dispatcher, he knew about the previous shoplifting incident and that the incident involved an African–American. He did not, however, know that plaintiffs were African–Americans. The same is true for Officer Mesick and Officer Valiquette, the latter of whom did not even know the details of the previous incident. When Officer Torrey arrived, he was told by store management that they suspected Mr. Robinson of shoplifting and that they wanted him re-

---

11. For example, Ms. Miner's statement to the Robinsons that they were being asked to leave because of an earlier incident involving minorities arguably would support the Robinsons' claim that T.J. Maxx's conduct toward them was motivated by racially discriminatory animus. T.J. Maxx, however, is not a state actor and, thus, its behavior is not subject to, and cannot form the basis of, an equal protection claim. Moreover, the fact that T.J. Maxx's employees may have been motivated by such animus does not necessarily lead to the same conclusion with respect to the Town Defendants.

moved from the store. Although Officer Torrey did not believe that Mr. Robinson had, as yet, committed a crime, he did think that his alleged behavior was suspicious.

After Officer Torrey had escorted the Robinsons to the vestibule, Officers Mesick and Valiquette arrived. Officer Mesick independently ascertained for himself the reason that the Robinsons were being asked to leave. Store management told him, as they had told Officer Torrey, that they suspected Mr. Robinson of shoplifting. Officer Valiquette, for his part, overheard Officer Torrey tell plaintiffs that they were being asked to leave because Mr. Robinson was suspected of shoplifting.

Given this information, the question then becomes whether the officers treated plaintiffs differently than they would have treated white people whom they also suspected of shoplifting. Plaintiffs point to nothing in the record which would support such a conclusion with respect to any of the officers. Nothing the officers said to plaintiffs indicates any animus on their part. In fact, some of their statements support exactly the opposite conclusion. For example, Officer Valiquette told plaintiffs that he could not believe that plaintiffs were being asked to leave simply because they were African–Americans. In addition, both Officer Mesick and Officer Torrey told plaintiffs, in response to accusations that they were being asked to leave because they were black, that this was not the case. Moreover, Officer Mesick's questions to plaintiffs about their possible involvement with an earlier incident do not lead to a conclusion that the officers harbored a discriminatory animus toward plaintiffs, especially in light of Ms. Miner's statement that plaintiffs were being asked to leave because of an earlier incident involving minorities.

The court is mindful that at the summary judgment stage it must draw all reasonable inferences in favor of plaintiffs and that its function at this stage of the litigation is solely to determine whether a factual issue exists not to decide this issue. The court's review of the record, however, demonstrates that plaintiffs have failed to establish that a factual issue exists with respect to whether the officers' actions were motivated, even in part, by a discriminatory animus, an element upon which plaintiffs bear the burden at trial. In this regard, the court concludes that the record is devoid of any evidence from which a reasonable trier of fact could find that the officers' actions toward plaintiffs were motivated by such animus. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' first cause of action to the extent that it is based upon a Fourteenth Amendment equal protection claim.[12]

### 5. Qualified Immunity

Having concluded that the defendant police officers did not violate any of plaintiffs' constitutional rights, there is no need for the court to address the defense of qualified immunity.

### 6. Municipal Liability

Having determined that the defendant police officers did not violate any of plaintiffs' constitutional rights, it follows that there can be no liability on the part of the Town of Colonie for the officers' conduct. The court notes, however, that even had it found such violations, plaintiffs have failed to establish the predicates necessary to a finding of municipal liability. This is evidenced by the fact that in response to an interrogatory concerning their *Monell* allegation, plaintiffs stated that "[p]laintiffs do not know any more detail than is contained in the complaint and in the responses to interrogatories 25 and 26. More detail might be known by plaintiffs after they have received further discovery from defendants." *See* Plaintiffs' Supplemental Responses to Defendants' Amended Interrogatories at Question 27, attached as Exhibit G to Sprio Affidavit dated July 2, 1993. Although discovery is now complete, plaintiffs still are unable to provide any detail concerning their claim against the Town of Colonie. Given this lack of affirmative evi-

---

**12.** Even if the court had framed the issue more broadly; i.e., whether the officers would have handled T.J. Maxx's request that plaintiffs leave the store differently had plaintiffs been white, on this record, the result would be the same.

dence to support their claim, the court concludes that plaintiffs have failed to create a genuine issue of material fact with respect to the liability of the Town of Colonie. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' first cause of action as it applies to the Town of Colonie.

### B. Second Cause of Action—42 U.S.C. § 1981

 Prior to the enactment of the Civil Rights Act of 1991, § 1981 provided that

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.[13]

 Prior to addressing the parties' contentions concerning the underlying merits of this claim, the court must determine whether plaintiffs can maintain an independent cause of action based upon § 1981 against the Town Defendants. Although the parties did not address this issue, it is clear, in light of the Supreme Court's decision in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), that this question must be answered in the negative.

Although *Jett* concerned the specific issue of whether a municipality could be held liable for its employees' violations of § 1981 under a theory of *respondeat superior*, the Court carefully analyzed the relationship between § 1981 and § 1983. After doing so, the Court held that

[t]he express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides the **exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.**

*Jett*, 491 U.S. at 735, 109 S.Ct. at 2723, 105 L.Ed.2d at 627 (emphasis added).

 In the present case, there is no dispute that the Town Defendants are state actors. Thus, plaintiffs cannot maintain an independent cause of action against them based upon a violation of plaintiffs' rights protected by § 1981. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' second cause of action.[14]

---

**13.** With the enactment of the Civil Rights Act of 1991, the original text of § 1981, cited above, was designated as subsection (a). In addition, two subsections were added to § 1981. First of all, subsection (b), which overrules the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), provides that "[f]or purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Secondly, subsection (c) which overrules, in pertinent part, the Supreme Court's decision in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination **and impairment under color of State law.**" 42 U.S.C. § 1981(c) (emphasis added). Since the actions that form the basis of plaintiffs' complaint occurred prior to the effective date of the Civil Rights Act of 1991 (November 21, 1991), these additions have no effect on plaintiffs' claims. *See Rivers v. Roadway Express, Inc.*, —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) (Section 101 of the Civil Rights Act of 1991, 42 U.S.C. § 1981, does not apply to preenactment conduct).

**14.** To the extent that plaintiffs' § 1981 claim rests upon their allegations that the Town Defendants violated their Thirteenth Amendment right to equal protection of the laws, see Discussion, *supra*, at II.A.2. Furthermore, to the extent that plaintiffs' § 1981 claim rests upon their contention that the Town Defendants interfered with their right to contract with T.J. Maxx, such an argument is totally unsupported by the record. In order for a third party to interfere with a contract, there must be an intent on the part of the alleged contracting parties to enter into an agreement with each other. In the present case, there has been no showing that any such intent existed. In fact, it was one of these parties, T.J. Maxx, that requested that the other party, the Robinsons, be removed from the premises. Rather than demonstrating an intent to contract,

C. *Third Cause of Action—42 U.S.C. § 1985(3)* [15]

 "Section 1985(3) creates no substantive rights, but merely provides a remedy for conspiracies to violate a person's right to equal·protection of the laws." *Philippeaux v. North Central Bronx Hosp.*, 871 F.Supp. 640, 656 (S.D.N.Y.1994) (citing *United Brothers [sic] of Carpenters and Joiners of America, Local 610, AFL–CIO v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983); *Great American Federal Savings and Loan v. Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979)). Since the court has concluded that the defendant officers did not deprive plaintiffs of their constitutional rights, plaintiffs cannot maintain a cause of action based upon an allegation that the Town Defendants conspired to deprive them of such rights. The court notes, however, that even if it had found such a deprivation, the Town Defendants would still be entitled to summary judgment on plaintiffs' third cause of action.

 To establish a violation of § 1985(3), plaintiffs must allege (1) that they are members of a protected class; (2) that the Town Defendants conspired to deprive them of their constitutional rights; (3) that the Town Defendants acted with class-based invidiously discriminatory animus; and (4) that they suffered injury as a result of the Town Defendants' actions. *New York State NOW v. Terry*, 886 F.2d 1339, 1358 (2d Cir. 1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338, 348 (1971)); *see also Thornton v. City of Albany*, 831 F.Supp. 970, 979 (N.D.N.Y.1993) (McCurn, S.J.). In the present case, the parties agree

that plaintiffs, as African–Americans, are members of a protected class. The parties dispute, however, whether the Town Defendants conspired to deprive plaintiffs of their constitutional rights and whether the Town Defendants acted with class-based invidiously discriminatory animus.

The Town Defendants assert that plaintiffs have failed to substantiate, in any way, their allegations of conspiracy under § 1985(3). *See* Town Defendants' Memorandum of Law at 11; Town Defendants' Reply Memorandum of Law at 12. To the contrary, plaintiffs argue that the officers' deposition testimony demonstrates that "[t]he defendant officers agreed with store employees and among themselves and decided and acted in concert to detain and remove the Robinsons against their will while they were shopping." *See* Plaintiffs' Memorandum of Law at 22 (citing Torrey Deposition at 35). In this regard, plaintiffs point to Officer Torrey's deposition testimony that he met with three store employees and that together they agreed to remove plaintiffs from the store. *See id.* (citing Torrey Deposition at 28–29, 45). Moreover, plaintiffs argue that Officers Mesick and Valiquette, without independent confirmation of plaintiffs' wrongdoing, continued plaintiffs' detention, helped to conduct a background check, and forced plaintiffs to leave the store. *See id.* Finally, plaintiffs assert that a reasonable jury could conclude that "[d]ue to the link by store employees between the Robinsons and the earlier arrest and defendant police officers' awareness of and willingness to detain and eject the Robinsons at the employees' request that there was a class-based animus." *See id.* at 21.

Despite plaintiffs' protestations to the contrary, the court finds that none of the facts

---

such a request leads to the inescapable conclusion that T.J. Maxx had no intention of entering into a contract with plaintiffs. Absent such intent, there is no set of facts that would support a finding that the Town Defendants interfered with plaintiffs' right to contract.

**15.** Section 1985(3) provides, in pertinent part, that

[i]f two or more persons in any State ... conspire ..., for the purpose of depriving, either directly or indirectly, any person ... of the equal protection of the laws, or of equal

privileges and immunities under the laws; ...; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

upon which plaintiffs rely demonstrate the existence of a conspiracy. There is no indication in the record that the officers conferred with each other and decided upon a course of action prior to confronting plaintiffs. First of all, Officer Torrey's initial encounter with plaintiffs occurred prior to the arrival of Officers Mesick and Valiquette. Moreover, Officer Mesick's decision to perform a background check on plaintiffs was made without conferring with either Officer Torrey or Officer Valiquette. In addition, it would be illogical to conclude that Officer Torrey's initial response to the call; i.e., conferring with store employees to determine the nature of the call and what action the employees wanted him to take, denoted a conspiracy. Based upon this record, the court finds that, even if it had concluded that the defendant police officers had deprived plaintiffs of their constitutional rights, no reasonable factfinder could find that they conspired to do so. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' third cause of action.[16]

### III. Pendent State Law Causes of Action

#### A. Fourth Cause of Action—New York State Human Rights Law

New York Executive Law § 296(2)(a) provides, in pertinent part, that

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, ..., because of the race, ..., color, ... of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof,
>
> ...

N.Y.Exec.Law § 296(2)(a) (McKinney 1993) (emphasis added).

For purposes of this statute, "[t]he term 'place of public accommodation, ...' shall include, ..., all places included in the meaning of such terms as: ... wholesale and retail stores and establishments dealing with goods or services of any kind, ..." N.Y.Exec. Law § 292(9) (McKinney 1993).

■ In support of their motion, the Town Defendants contend that they do not fall within the definition of persons liable under § 296(2)(a). See Town Defendants' Memorandum of Law at 12. Moreover, they argue that they were not agents of T.J. Maxx. See id. To the contrary, plaintiffs assert that the police officers acted, at least in part, as agents of T.J. Maxx. See Plaintiffs' Memorandum of Law at 23. Thus, they contend that there is at least a triable issue of fact as to whether the police officers who enforced the private discrimination of T.J. Maxx are liable under § 296(2)(a). See id.

In support of their contention that the police officers acted as agents of T.J. Maxx, plaintiffs direct the court's attention to Officer Torrey's and Officer Mesick's deposition testimony in which they stated that they were acting on behalf of T.J. Maxx and that the request of the T.J. Maxx employees gave them the authority to seize and remove plaintiffs from the store. See Plaintiffs' Memorandum of Law at 23 (citing Torrey Deposition at 35, 37; Mesick Deposition in *Flowers v. T.J. Maxx* at 21).[17]

■ Under New York law,

> [t]hree elements must be established in order to prove the existence of an agency: (1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking. (citation omitted). No agency relationship can be established where the alleged principal **lacks the essential right of control over the alleged agent.** (citations omitted).

16. Even if the court had concluded that a conspiracy existed, the Town Defendants, nonetheless, would be entitled to summary judgment on this cause of action because plaintiffs failed to demonstrate the existence of any class-based invidious discriminatory animus on the part of the defendant officers. See Discussion, *supra,* at II. A.4.

17. At his deposition Officer Torrey stated "I was working as an agent of T.J. Maxx. See Torrey Deposition at 35, 37.

*In re Rubin Bros. Footwear, Inc.,* 119 B.R. 416, 421–22 (S.D.N.Y.1990) (emphasis added). Even if the court were to assume that § 296(2)(a) was intended to apply to the Town Defendants,[18] plaintiffs have failed to set forth any facts that would support a finding that an agency relationship existed between the Town Defendants and T.J. Maxx. While it might be argued that an inference could be drawn that plaintiffs have, at least, raised an issue of fact with respect to the first two elements of such a claim, there is absolutely nothing in the record to support a finding that T.J. Maxx had any right to control the actions of the defendant police officers. Absent any affirmative evidence with respect to this third element of their agency claim, plaintiffs cannot maintain their § 296 cause of action. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' fourth cause of action.

### B. Fifth Cause of Action—Defamation

■ In order to establish a prima facie case of defamation, plaintiffs must demonstrate the existence of a "(1) defamatory statement of fact, (2) regarding the plaintiff[s], (3) published to a third party, (4) injury to the plaintiff[s]." *Curti v. Girocredit Bank,* No. 93 Civ. 1782, 1994 WL 48835, at *2, 1994 U.S.Dist. LEXIS 1473, at *6 (S.D.N.Y. Feb. 14, 1994) (citing *Weldy [v. Piedmont Airlines, Inc.,]* 985 F.2d [57,] 61 [(2d Cir.1993)]). Under New York law, " '[a] communication is defamatory ... if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *Id.* (quoting *Morrison v. National Broadcasting Co., Inc.,* 19 N.Y.2d 453, 280 N.Y.S.2d 641, 644, 227 N.E.2d 572, 574 (1967) (citing in turn the Restatement of Torts, § 559)).

■ In support of their present motion, the Town Defendants assert that they made no statements that were either false or defamatory. *See* Town Defendants' Memorandum of Law at 21–22. Moreover, they con-

tend that the individuals who made this incident public knowledge were plaintiffs who contacted the NAACP and the press and held a public press conference. *See id.* at 22. Plaintiffs neither dispute these facts nor offer any arguments to support their claim. Therefore, the court concludes that plaintiffs have failed to establish a genuine issues of material fact with respect to this cause of action. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' fifth cause of action.

### C. Sixth Cause of Action—Unlawful Imprisonment

■ The court need not spend much time discussing plaintiffs' state law cause of action based upon a claim of unlawful imprisonment. Except for the requirement that plaintiffs' § 1983 claim based upon an allegation of unreasonable seizure be under color of state law, this claim is substantially the same. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991) (quoting *Raysor v. Port Authority of New York and New Jersey,* 768 F.2d 34 at 39) (2d Cir.1985). Thus, for the reasons relied upon in its discussion of plaintiffs' Fourth Amendment unreasonable seizure claim, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' sixth cause of action. *See* Discussion, *supra,* at II.A.3.

### D. Seventh Cause of Action—Intentional Infliction of Emotional Distress

■ To constitute intentional infliction of emotional distress under New York law, the conduct complained of must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Martin v. Citibank, N.A.,* 762 F.2d 212, 220 (2d Cir.1985) (citing *Fischer v. Maloney,* 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215, 1217 (1978)); *see also Curti v. Girocredit Bank,* No. 93 Civ. 1782, 1994 WL 48835, 1994 U.S.Dist. LEXIS 1473

---

**18.** Plaintiffs cite no caselaw to support their position that New York Executive Law § 296(2)(a) was intended to include those in the position of the Town Defendants. Moreover, the court's own research uncovered no such caselaw.

(S.D.N.Y. Feb. 10, 1994). The elements which constitute a prima facie case of intentional infliction of emotion distress are "(1) an extreme and outrageous act by the defendant, (2) an intent to cause severe emotional distress, (3) resulting severe emotional distress, (4) caused by the defendant's conduct." *Burba v. Rochester Gas and Elec. Corp.,* 90 A.D.2d 984, 456 N.Y.S.2d 578, 579 (4th Dep't 1982); *see also Richard L. v. Armon,* 144 A.D.2d 1, 2–5, 536 N.Y.S.2d 1014, 1015–16 (2d Dep't 1989). As this court recently explained, " 'liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' " *Doolittle v. Ruffo,* No. 88–CV–1175, slip op. at 22 (N.D.N.Y. Mar. 14, 1994) (McCurn, S.J.) (quoting *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293 at 303, 461 N.Y.S.2d 232 at 236, 448 N.E.2d 86 at 90 (quoting in turn Restatement of Torts, Second § 46, subd. [1], comment d)).

■ In the present case, plaintiffs contend that Officer Torrey's actions were substantially certain to cause plaintiffs emotional distress. *See* Plaintiffs' Memorandum of Law at 27. Specifically, plaintiffs complain that Officer Torrey's actions in threatening them with arrest for trespass, calling for backup prior to approaching them, and detaining them in public view in the main entrance to the store as well as Officer Mesick's request for their driver's licenses and his order that Officer Torrey perform a criminal background check on them constitute outrageous conduct. *See id.* at 27–28. Read in the light most favorable to plaintiffs, these actions undoubtedly upset plaintiffs and caused them some embarrassment. Nonetheless, the court finds that, as a matter of law, none of the police officers' actions were so egregious as to be beyond all bounds of decency. *See Richard L.,* 144 A.D.2d at 5, 536 N.Y.S.2d at 1017. Accordingly, the court grants the Town Defendants' motion for summary judgment with respect to plaintiffs' seventh cause of action.

### CONCLUSION

For the reasons stated above, the court **GRANTS** the Town Defendants' motion for

summary judgment in its entirety. As a result, the court **DENIES** plaintiffs' cross-motion for partial summary judgment in its entirety. In light of these decisions, the court directs the clerk of the court to enter judgment in favor of the Town Defendants and against plaintiffs and to dismiss the complaint in its entirety. With respect to the Town Defendants' counterclaim against T.J. Maxx, because it is based entirely upon a finding of liability on the part of the Town Defendants, this counterclaim should, likewise, be dismissed.

**IT IS SO ORDERED.**