Carriene NEVIN, Plaintiff,

v.

CITIBANK, N.A., et al., Defendants.

No. 00 CIV. 0029(CM).

United States District Court,
S.D. New York.

July 28, 2000.

Barbara Lerman, White Plains, NY, for Plaintiff.

John M. Flannery, Wilson, Elser, Moskowitz, Edelman & Discker, LLP, White Plains, NY, for Town of Eastchester and Police Defendants.

Michael M. Horowitz, Gilroy Downes Horowitz & Goldstein, New York City, for May Department Stores, Lord & Taylor and Robert Bottass.

J. Kelley Nevling, Jr., Levi Lubarsky & Feigenbaum LLP, New York City, for Citibank, S.D., Citibank, N.A., and Citicorp Credit Services, Inc.

MEMORANDUM DECISION AND ORDER GRANTING THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McMAHON, District Judge.

*Summary*

Plaintiff, an African–American woman, sued her credit card company, a department store and the town police following an incident during which her credit card was blocked and she was questioned by police concerning possible unauthorized use of the card. She brought a variety of state and federal civil rights claims and common law tort claims based on her theory that the action taken by Defendants constituted "racial profiling" motivated by racial animus. Defendants have moved to dismiss the case and/or for summary judgment. For the reasons stated below, Defendants' motions are granted and the case is dismissed.

## I. THE FACTS

The following are the facts, viewed in a light most favorable to the Plaintiff:

On June 18, 1999, Carriene Nevin, an African–American woman, took her Citibank Visa card to the Lord & Taylor store at Vernon Hills Shopping Center in Eastchester.[1] Nevin was a frequent shopper at that Lord & Taylor, and had never experienced any problems or discrimination at the store. Nevin bought a great deal of merchandise in a variety of departments, including children's clothes, lingerie and men's clothes. After Nevin completed the bulk of her purchases, she went to get her car to bring it to the front of the store to collect her packages. On the way to the parking lot, she stopped and purchased some cologne. She took the package of cologne with her to the car, and then drove to the front, where a Lord & Taylor employee helped her load the other packages. According to her own testimony, she drove away, but returned to the store some time later to give that employee a $20 tip.

This behavior attracted the attention of Robert Bottass, a security officer em-

---

1. The parties refer to this store as "the Scarsdale store," as the merchants in that area of Eastchester, which is just south of the tonier Village of Scarsdale, use "Scarsdale" instead of "Eastchester" in their addresses. However, the store lies well within the boundaries of the Town of Eastchester, and the police who responded—and who have been sued—were Eastchester police.

ployed by Lord & Taylor. Bottass watched Nevin on the closed-circuit video monitors and observed what she was doing. (Am.Cplt.¶53.) After ascertaining the identity of the bank that issued the credit card, Bottass called either Citibank or Citicorp Credit Service, Inc. ("CCSI") to report that a "black female was making large purchases with a Citibank Visa card" and that "she makes the purchases, she puts the merchandise in her vehicle and returns to the store." (Am.Cplt.¶22.) The credit card had not been reported lost or stolen. (Am.Cplt.¶30.)

In response to Bottass' call, Citibank/CCSI put a stop on the card and called the Nevin home to ascertain whether the card was being misused. The person who answered the first call hung up before the CCSI representative could obtain the necessary information. A second call to the home went unanswered.

Nevin completed her business at Lord & Taylor and proceeded to another store, Charisma, where her credit card was declined. Plaintiff was told she would have to talk to her credit card company to clear up any problems. Because she was in a hurry, Plaintiff refused to come to the phone at that time, and instead pulled out another card, completed her purchase, and drove home with her merchandise.

In the meantime, Edward McLaughlin, a fraud supervisor at Citibank/CCSI, called Lord & Taylor, and authorized Lord & Taylor to detain the shopper. He told Bottass that Citibank/CCSI suspected that the shopper might be holding a stolen credit card. Because Nevin had already left the premises, Robert Bottass called the Eastchester Police and reported the

possible misuse of the credit card. In response to the complaint, Police Officer Anthony Mignone went to Lord & Taylor and met with Bottass, who, according to the police report, described the incident and advised Mignone that Citibank Visa had the card listed as lost or stolen. Bottass provided Officer Mignone with Plaintiff's license plate number.

Police Officer Michael Denning was dispatched to the Nevin home (also located in Eastchester) to investigate. Plaintiff was not there, and Denning asked her husband and mother to have her call the station house when she returned.

When Nevin got home, she realized she forgot one of the jackets she had purchased at Lord & Taylor and returned to the store. After showing her receipt at the counter where she had left the jacket, she took the jacket and returned home for a second time.

Shortly thereafter, Denning and Mignone came to her home and questioned Nevin on the front porch. The encounter took place at 4:30 p.m. and lasted between ten and fifteen minutes. Nevin was not touched, restrained or handcuffed while she was questioned. By her own admission (in testimony given at a New York Gen. Mun. L. § 50–h hearing), Nevin did not try to terminate the conversation or complain to the officers about their presence on her property. She neither tried to leave nor asked the officers if she could leave. Satisfied that no crime had been committed, the detectives left the Nevin residence without asking Plaintiff to come to the station or taking any official action. They concluded that the report was unfounded and closed the file.[2]

**2.** Plaintiff has submitted a copy of the police report prepared by Officer Mignone, which contains a slightly different version of the events:

> Arrived at [Lord & Taylor] and met with Mr. Bottass. He stated that a black female had come into the store an made two purchases for approximately $1600 and charged them to a VISA account []. The female went to her vehicle and then re-

turned to make a third purchase. Upon presenting the same VISA card, the purchase was denied by Citibank as the card was reported lost/stolen. Security attempted to stop the female, but she continued out of the store. They provided a vehicle registration [], which come [sic] back to the person involved. P.O. Denning responded to her home and spoke with Mrs. Nevin. She stated that she had no knowledge that

The incident remains alive, however. Nevin has sued everyone involved—Lord & Taylor, its parent corporation and Bottass; Citibank and CCSI and two of their employees; the Town of Eastchester [3] and the two officers who questioned her. She contends that she was slandered, otherwise tortiously injured and discriminated against in what she describes as an incident of "racial profiling," a pernicious practice that has been much in the news of late.[4]

Plaintiff has already agreed to withdraw her claim against McLaughlin and Spitz, who are not amenable to suit in this District. (*See* Stipulation and Order, April 5, 2000, dismissing claims against defendants McLaughlin and Spitz).

Citibank and CCSI have moved to dismiss the complaint as against them; in the alternative, they ask for summary judg-

ment in their favor. Their motion is granted.

Lord & Taylor, May Company and Robert Bottass have together moved for summary judgment. Their motion is granted and the claims against those Defendants are dismissed.

The Town of Eastchester and the police officers have also moved for dismissal and summary judgment. Their motion is also granted.

Although only the Town Defendants have filed an Answer, all the parties have added a great deal of material to the record, and the Plaintiff has submitted an extensive affidavit in support of her opposition motions. I will therefore treat all three Defendants' motions as motions for summary judgment pursuant to Rules 12(b) and 56(f).[5]

the card was reported lost/stolen, but that she did have a problem with another card. Lord and Taylor was advised of the situation and was satisfied with the actions taken. Mrs. Nevin stated that she would contact Citibank in reference to this matter, and correct the error.
(Eastchester Police Report, June 18, 1999, attached to Nevin Aff. at Exh. C.)

3. Plaintiff also named the Eastchester Police Department as a separate named defendant, which is improper under New York law, since a suit against a municipal department is a suit against the municipality itself. *See Manning v. County of Westchester*, No. 93 Civ. 3366, 1995 WL 12579, *2 (S.D.N.Y. Jan.5, 1995); *Wilson v. City of New York*, 800 F.Supp. 1098, 1101 (E.D.N.Y.1992). The complaint is therefore dismissed as against the Police Department.

4. Unlawful "racial profiling" by police, which manifests itself in selecting minorities for traffic stops, *Terry* stops and other searches, has been a subject of much political and legal discussion. *See Illinois v. Wardlow*, —— U.S. ——, 120 S.Ct. 673, 681 n. 10, 145 L.E.2d 570 (2000)(discussing reports of unlawful racial profiling by New Jersey State Police and Boston Police Department). Racial profiling by customs and immigration officials at our nation's airports has also come under scrutiny and is the subject of at least one federal class action suit. *See Anderson v. Cornejo*, Nos. 97 C 7556, 99 C 3786, 2000 WL 286902 (N.D.Ill. March 10, 2000)(class action brought by Afri-

can–American women subjected to strip searches and gynecological examinations by Department of Customs officials at O'Hare Airport).

The practice is not limited to law enforcement officials. Evidence of racial profiling in retail establishments has been exposed in television investigative reports. *See ABC News 20/20: Under Suspicion, Security Guards Unfairly Target Black Shoppers* (ABC television broadcast, June 8, 1998), available at 1998 WL 5433617. And racial profiling by retailers has been the subject of at least two other lawsuits in this Circuit. *See Brown v. Wal-Mart Stores, Inc.*, No. 96–Cv–1500, 1998 WL 178798 (Apr. 10, 1998, N.D.N.Y.); *Robinson v. Colonie*, 878 F.Supp. 387 (N.D.N.Y.1995). *See also*, James L. Fennessy, *New Jersey Law and Police Response to the Exclusion of Minority Patrons from Retail Stores Based on the Mere Suspicion of Shoplifting*, Comment, 9 Seton Hall Const. L.J. 549 (Spring 1999)(discussing New Jersey constitutional implications of racial profiling of shoppers).

5. Plaintiff contended at oral argument that discovery is required because she needs to depose one Defendant, Robert Bottass, on the issue of what words he used when he called the Eastchester Police Department to report Nevin's activity at the Lord & Taylor. However, Plaintiff herself has submitted Bottass' sworn affidavit in support of her memorandum opposing summary judgment. I therefore do not find that Plaintiff has met her burden to show why such discovery is needed

## II. DISCUSSION

### A. *The Allegations*

Plaintiff's Amended Complaint alleges the following against all Defendants: intentional and negligent infliction of emotional distress (fourth and fifth causes of action); prima facie tort (sixth cause of action); false imprisonment (seventh cause of action); deprivation of her rights under New York civil rights laws and the New York Human Rights Law (ninth and tenth causes of action); deprivation of her civil rights under the First and Fourteenth Amendments and 42 U.S.C. § 1981 (eleventh cause of action); and denial of public accommodations in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000a (twelfth cause of action). Plaintiff alleges against May Company, Lord & Taylor and Robert Bottass slander and slander per se (first and second causes of action), and against May Company, Lord & Taylor, Bottass and Citibank/CCSI injurious falsehood (third cause of action). She also alleges a theory of respondeat superior liability (eighth cause of action) against Citibank/CCSI, Lord & Taylor, May Company and the Town of Eastchester.

### B. *Standard*

Summary judgment is appropriate where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, to defeat summary judgment, the non-moving party

must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### C. *Citibank and CCSI's Motion to Dismiss*

Plaintiff's allegations against Citibank and CCSI arise from their communications with Lord & Taylor about her credit card account, including the statement that Nevin should be apprehended under suspicion of misuse of the credit card. Citibank and CCSI move to dismiss all the claims asserted against them on the ground that they, as financial institutions, enjoy an unqualified privilege to disclose any possible violation of law without fear of being sued. Defendants make a straightforward argument, and on slightly different facts, they would unquestionably be entitled to dismissal on this ground. On the allegations of the complaint at bar, however, they are not.

In 1992, Congress passed the Annunzio–Wylie Act, which gave the Secretary of the Treasury the power to require banks and other financial institutions to report suspicious transactions to the appropriate authorities, and contained other provisions with respect to the mandatory or voluntary disclosure of suspicious activities.[6] In order to encourage financial institutions to report possible criminal activity, the Act gave financial institutions and their officers, employees and agents complete immunity from suit based on their having reported or disclosed a possible crime:

> Liability for disclosure. Any financial institution that makes a disclosure of any possible violation of law or regulation or a disclosure pursuant to this

---

to defeat Defendants' motions. *See Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir.1999); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir.1995).

**6.** The Act was passed as the Annunzio–Wylie Act Anti–Money Laundering Act, Pub.L. No. 102–550, 106 Stat. 4044, and is codified as amended in scattered sections of United States Code.

subsection or any other authority, and any director, officer, employee, or agent or such institution, *shall not be liable to any person under any law or regulation of the United States or any constitution, law or regulation of any State or political subdivision thereof, for such disclosure* . . . .

31 U.S.C. § 5318(g)(emphasis added.)

Although the immediate impetus for passage of this law was the desire to uncover and punish money laundering, particularly in connection with drug trafficking, Congress in its wisdom chose to pass a statute that covered considerably more territory. Thus, financial institutions (such as Citibank, an FDIC insured commercial bank, and CCSI, an operator of a credit card system, both of which are "financial institutions" under 31 U.S.C. § 5312(a)(2) enjoy immunity whenever they disclose "any possible violation of law or regulation.") 31 U.S.C. § 5318(g)(3). The wording chosen by Congress encompasses the complete ambit of criminal behavior, whether money laundering by international drug kingpins or credit card fraud at a shopping mall (which is both a Federal crime, *see* 15 U.S.C. § 1644(a), and a class A misdemeanor under New York Penal Law, *see* N.Y. Pen. L. § 165.17 (McKinney 1999)). Moreover, the regulations promulgated by the Secretary of the Treasury under the statute specifically require so-called suspicious activity reports ("SARs") to be filed whenever a financial institution detects "a known or suspected violation of federal law, a suspected transaction related to money laundering activity, or a violation of the Bank Secrecy Act." 12 C.F.R. § 208.20(d) (1997). Further, the OMB form used by financial institutions to complete an SAR provides, under the heading "summary characterization of suspicious activity," two choices relating to fraudulent use of credit cards. *See* OMB Pub. No. 7100–0212, (37(h)("Counterfeit Credit/Debit Card" and 37(j) "Credit Card Fraud")). Thus, even if the language of the statute were ambiguous (which it is

not), the regulations promulgated thereunder make clear that a report of possible money laundering is but one species of activity that qualifies for Annunzio–Wylie immunity.

Additionally, by using the words "possible" (in the statute) and "suspected" (in the regulations) to identify reportable violations, the provision grants immunity for reports that turn out to be erroneous, as well as those that are well founded. Indeed, only last year the Second Circuit held that "the plain language of the safe harbor provision describes an unqualified privilege," one that "does not limit protection to disclosures based on a good faith belief that a violation has occurred." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir.1999). In so holding, *Lee* went further than had the Eleventh Circuit in *Lopez v. First Union National Bank*, 129 F.3d 1186 (11 Cir.1997), which had read a good faith belief requirement into the unambiguously broad language of the Annunzio–Wylie Act.

The facts in *Lee* are not dissimilar to those at bar: a Bankers Trust employee, who was under investigation for possible illegal activity, sued the bank on a variety of theories, including defamation and false imprisonment, because Bankers Trust had filed an SAR with the Office of the United States Attorney for the Southern District of New York. The District Court (Batts, J.) dismissed the complaint because the unqualified Annunzio–Wylie privilege meant that no claim could be stated against Bankers Trust for the contents of the SAR. The Court of Appeals affirmed.

There is, however, one critical difference between the facts here and in *Lee*, and it is on that difference that the result turns. In *Lee*, the bank filed an SAR, a type of report that is specifically contemplated in the regulations, with federal law enforcement authorities. Both the District Court and the Court of Appeals in *Lee* relied heavily on the fact that (1) financial institutions are required by statute to file SARs, but (2) financial institutions are prohibited

by statute from disclosing either that an SAR has been filed or any of the information contained therein. So absolute is this prohibition that a financial institution named as a defendant by a plaintiff who suspected that an SAR had been filed could not even defend itself before a court. Thus, not only the plain language of the statute but also sound public policy dictated that anything contained in an SAR enjoy an unqualified privilege.

▇▇▇ Here, by contrast, there is no allegation that an SAR was filed. Nor, under the regulations, would Citibank or CCSI be required to file an SAR, because there was no indication that the loss of funds involved met the statutory minimum. Neither Citibank nor CCSI made a report to anyone directly connected with law enforcement. However, someone from CCSI is alleged to have authorized a private party, Lord & Taylor, to call the police. This leads to a question that neither party has addressed: does Annunzio–Wylie immunity extend to a communication between a financial institution and another private entity? I find it does not.

As discussed below, New York defamation law protects communications between private citizens and law enforcement officials through the application of a qualified privilege. The New York Court of Appeals has, however, explicitly rejected extending an absolute immunity from liability to such communications. Thus, under tort law, a private party who communicates directly with law enforcement officials does not enjoy the kind of blanket immunity provided under Annunzio–Wylie. In addition, the Federal regulations at issue here clearly limit the immunity to communications made to law enforcement and regulatory agencies; nothing in the regulations can be read to extend such immunity to communications to other private entities. Indeed, the regulations appear to extend the safe harbor only to "reports of suspected or known criminal violations and suspicious activities *to law enforcement and financial institution supervisory au-*

*thorities.*" 12 C.F.R. § 208.62(k)(1997)(emphasis added). *See also* 12 C.F.R. § 563.18(d)(31)(1997)(applying same language to thrift institutions' reports of suspicious activities).

Here, to the extent any representative of Citibank and CCSI made any disclosure about suspected criminal activity, he made it to Lord & Taylor, which is neither "law enforcement" nor a "financial institution supervisory authority." No doubt, the disclosure was made with the understanding that Bottass would immediately call the police, and that is precisely what happened. However, it would stretch both the language of the Annunzio–Wylie privilege and the intent behind it to hold that it encompasses conversations with civilians that may, in the fullness of time, be reported to law enforcement. If Citibank and CCSI wish to invoke Annunzio–Wylie protection in cases of suspected credit card fraud (which are unquestionably covered by the statute), then they should contact local law enforcement directly.

Notwithstanding my ruling under Annunzio–Wylie, I agree with Defendants Citibank and CCSI that the Amended Complaint nonetheless fails to state a claim against them, under any of Plaintiff's many theories of liability.

**B.** *Allegations Against Citibank, CCSI, Lord & Taylor, May Company and Bottass*

1. *Slander and Slander Per Se (First and Second Causes of Action)*

In her first and second causes of action, Plaintiff alleges that Bottass' report to Citibank and CCSI of her activity in the store, and his later call to the Eastchester Police, constitute slander and/or slander per se. The May Company, Lord & Taylor and Bottass move for summary judgment on the grounds that (1) the statements made by Bottass alleged to constitute slander and/or slander per se were true and therefore not defamatory; (2) to the extent any of his statements

were not true, he was qualifiedly privileged to make them.

■■■ Slander is defined as "the speaking of base and defamatory words which tend to prejudice another in his reputation, office, trade, business, or means of livelihood," and requires pleading special damages. 43A N.Y.Jur.2d § 1 (1994). A statement charging a plaintiff with a serious crime can be considered slander per se, and does not require pleading special damages. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992). Truth is, of course, an absolute defense to slander or slander per se. *See* 43A N.Y.Jur.2d § 98 (1994)(citing cases.)

■■■ Plaintiff's Complaint alleges that Mr. Bottass made the statement "a black female was making large purchases with a Citibank visa card." (Am.Cplt.¶ 22.) Defendants contend that because Plaintiff is, in fact, an African–American, and she made over $2300 in purchases with her Visa on the day in question, Bottass' statement was true. The second alleged defamatory statement was that, "she makes purchases, she puts the merchandise in her vehicle and returns to the store." (Am.Cplt.¶ 22.) Mrs. Nevin herself testified that she placed some packages in her car and later returned to the store to give an employee a $20 tip. Thus, both these statements were true, and by law cannot constitute slander.[7]

Plaintiff further contends, however, that in making these statements, Mr. Bottass falsely stated that "Plaintiff was committing a crime." (Am.Cplt.¶ 23, 24) Defendants respond that Bottass did not arguably state that he "knew" a crime was being committed or that Plaintiff was "in fact" committing a crime. At most, Defendants state, Bottass stated a suspicion about Plaintiff's activities. And statements of suspicions, Defendants argue, cannot be defamatory as a matter of law.

In his affidavit to the Court, Bottass stated that he "considered the behavior observed to be potentially suspicious" and that he therefore "telephoned Citibank's credit card division and advised what I observed." There is no evidence in this record that, in his conversation with Citibank, Bottass ever said that a crime was being committed; he simply reported that he was suspicious that a crime was being committed.

■■■ However, Plaintiff also alleges that "Defendant Bottass as aforesaid, Defendants Citibank, CCSI and/or Lord & Taylor communicated to the Police Department that Plaintiff had committed a crime." (Am.Cplt.¶ 28.) Bottass contends that the sum and substance of his comments to the police was simply to pass on that Citibank/CCSI had told him that the suspect should be arrested. These comments, he argues, do not amount to a statement of criminality. I disagree. By relaying Citibank's statement that Nevin was using a stolen credit card and that she should be detained, Bottass made a statement that imputed the commission of criminal offense, which may constitute slander per se.

I find, however, that Bottass was privileged to make such a statement to the police and therefore is entitled to summary judgment on this claim.

■■■ Under New York law, "[p]ublic policy demands that certain communications, although defamatory, cannot serve as the basis for the imposition of liability in a defamation action." *Toker v. Pollak*, 44 N.Y.2d 211, 218, 405 N.Y.S.2d 1, 376 N.E.2d 163 (1978)(citing *Shenkman v. O'Malley*, 2 A.D.2d 567, 572, 157 N.Y.S.2d 290 (1956), and others). Any communications that fall within the public policy category are deemed privileged, either absolutely or qualifiedly. *See id.* The absolute privilege, which provides an absolute immunity from liability, protects communica-

---

7. I therefore need not reach the question of whether these statements might be entitled to protection under the common interest privilege.

tions, regardless of the motive of the speaker. This immunity has, in general, been applied to individuals participating in a variety of public functions. *See Pecue v. West,* 233 N.Y. 316, 135 N.E. 515 (1922)(applying immunity to judicial proceedings); *Roberts v. Pratt,* 174 Misc. 585, 21 N.Y.S.2d 545 (1940)(legislative proceedings); *Cheatum v. Wehle,* 5 N.Y.2d 585, 186 N.Y.S.2d 606, 159 N.E.2d 166 (1959)(executive proceedings). "The absolute protection afforded such individuals is designed to ensure that their own personal interests—especially fear of a civil action, whether successful or otherwise—do not have an adverse impact upon the discharge of their public function." *Toker,* 44 N.Y.2d at 219, 405 N.Y.S.2d 1, 376 N.E.2d 163 (citing Restatement Torts [2d], § 584 *et seq.*) Here, Bottass is not a participant in a public function. Rather, he and Lord & Taylor are private entities who communicated with public officials.

■■■ While he is not absolutely immune from liability, Bottass does enjoy a qualified privilege. "A communication is said to be qualifiedly privileged where it is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his own affairs, in a matter where his interest is concerned." *Toker,* 44 N.Y.2d at 219, 405 N.Y.S.2d 1, 376 N.E.2d 163 (internal quotation omitted ) The statements made by a defendant claiming the qualified privilege must be expressed "in a reasonable manner and for a proper purpose." William L. Prosser, *Prosser on the Law of Torts,* § 115, at 786 (4th ed.1980). Statements made by individuals to law enforcement officers are generally accorded the qualified privilege. *See Toker,* 44 N.Y.2d at 220, 405 N.Y.S.2d 1, 376 N.E.2d 163 (citing cases). The New York Court of Appeals explained the policy behind this rule:

A qualified privilege is sufficient to foster the public purpose of encouraging citizens to come forth with information concerning criminal activity. If the information is given in good faith by an individual who believes the information to be true, he is protected against the imposition of liability in a defamation action, notwithstanding that another, perhaps possessed of greater wisdom, would not have reported the information.

*Toker,* 44 N.Y.2d. at 221, 405 N.Y.S.2d 1, 376 N.E.2d 163 (citation omitted).

■■■ The qualified privilege does not provide an absolute immunity from liability, but rather negates the implied malice flowing from a defamatory statement. *See* 43A N.Y.Jur.2d § 113 (1994). Thus, a plaintiff can overcome the privilege by showing malice—evidence that the defendant knew the statement to be false, but made it anyway. Plaintiff has failed to do that here. There is not one scintilla of evidence in the record—aside from Plaintiff's assertion that Citibank (not Bottass) "knew the credit card was not stolen"—to support any inference of malice. Even accepting the fact that Plaintiff herself had never reported the card stolen, there is no evidence in the record to contradict Bottass' statement that his statements to Citibank were simply a report of his suspicions, and that his statements to the Police were a report of Citibank's request to detain Nevin on suspicion of criminal activity. In fact, in her own § 50–h statement, Plaintiff acknowledged that her pattern of shopping on the day in question could be construed as suspicious. (*See* Nevling Reply Decl. Ex. F at 208.) Contrary to Plaintiff's conclusory allegation, there is no way Bottass was in a position to "know" that Plaintiff was not engaging in criminal activity.[8] That job was left for the Police,

8. Only Citibank/CCSI was in a position to verify whether, in fact, the credit card was being used improperly. The facts here are thus distinguishable from the case of *Boyd v. Nationwide Mutual Insurance,* 208 F.3d 406,

410 (2d Cir.2000). There, the Second Circuit reversed this Court's dismissal of a defamation claim on the basis of qualified privilege, noting that dismissal prior to discovery was not appropriate where the defendant was in

who, it turns out, discovered the facts of the matter in rather short order, and closed their file.

Thus, because any statements Bottass made imputing criminal behavior were either true or qualifiedly privileged, the first and second causes of action against the Lord & Taylor Defendants are dismissed.

### 2. *Injurious Falsehood*

In her third cause of action, plaintiff alleges that Citibank/CCSI, Lord & Taylor, May Company and Robert Bottass committed the tort of "injurious falsehood" by publishing statements that harmed her.

■■■■ Under New York law, "[t]he tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business or property." *Waste Distillation Technology, Inc. v. Blasland & Bouck Engineers, P.C.,* 136 A.D.2d 633, 634, 523 N.Y.S.2d 875, 877 (2d Dept.1988); *Cunningham v. Hagedorn,* 72 A.D.2d 702, 703, 422 N.Y.S.2d 70, 74 (1st Dept.1979). *See also* 44 N.Y. Jur.2d § 261, at 95 (1994). Plaintiff alleges that she had some difficulty using her Citibank Visa card following the false report. However, she does not allege that any business of hers was damaged by the episode. Her general allegation that "as a direct result of Defendants' false statement, Plaintiff suffered a loss of security, freedom to do business, and she was caused to miss her reserved flight scheduled for June 18, 1999, all in the sum of special damages of $237.00" is insufficient, because Plaintiff neither identifies how she was damaged in her business (indeed, she does not even identify what business she is in) nor states how missing her flight was tied either to the alleged trade libel or to her unidentified trade. Thus, the claim is fatally deficient. *See Nyitray v. Johnson,* 1999 WL 14013, No. 96 Civ. 6150 (S.D.N.Y. Jan. 14, 1999), *aff'd*

*without published opinion,* 166 F.3d 1201 (2d Cir.1998).

The third cause of action is therefore dismissed.

### 4. *Intentional Infliction of Emotional Distress*

In her fourth cause of action, Plaintiff contends that the Citibank and Lord & Taylor Defendants intentionally inflicted emotional distress—the Citibank Defendants by authorizing her arrest in their conversation with Bottass, and the Lord & Taylor Defendants by Bottass' setting the events in motion by his calls to Citibank and the police. This claim is likewise deficient.

■■■■ Historically, New York did not recognize the tort of intentional infliction of emotional distress. *See Howell v. New York Post,* 81 N.Y.2d 115, 119–20, 596 N.Y.S.2d 350, 352, 612 N.E.2d 699 (1993). Even today, the tort is highly disfavored under New York law, and recovery is limited to cases where defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Fischer v. Maloney,* 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215 (1978). *See also Howell,* 596 N.Y.S.2d at 353, 612 N.E.2d 699. As the Second Circuit recognizes, "New York courts have been very strict in applying these principles." *Martin v. Citibank,* 762 F.2d 212, 220 (2d Cir.1985). Indeed, the New York Court of Appeals has emphasized that the "requirements of the rule are rigorous and difficult to satisfy ... of the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous." *Howell,* 81 N.Y.2d at 121, 596 N.Y.S.2d at 353, 612 N.E.2d 699. Ordinarily, whether the challenged conduct is

possession of information from which it could have ascertained whether the statement was

true or not. Plaintiff has not brought a defamation claim against Citibank/CCSI.

sufficiently outrageous will be determined as a matter of law. *Id.*

■ Plaintiff, seeking to fit this incident within the realm of racial profiling, alleges that she was the victim of such profiling—that she was singled out from among all shoppers at Lord & Taylor for surveillance, inquiry and police investigation because she · is African–American. She urges this Court to ignore a long line of cases holding that racially-tinged behavior that is no less, and perhaps more, offensive than that alleged here does not come close to clearing the extraordinarily high bar set by the New York Court of Appeals for the tort of intentional infliction of emotional distress. In particular, she urges this Court to ignore controlling Second Circuit precedent, *Martin v. Citibank*, 762 F.2d 212 (2d Cir.1985). In that case, the Court of Appeals held that plaintiff's claim of intentional infliction of emotional distress failed as a matter of law, even though she had proved to a jury's satisfaction that she was singled out for questioning, subjected to a criminal investigation and forced to take a lie detector test because she was "a black woman." *Id.* at 220. *See also Brown v. Wal–Mart Stores, Inc.*, No. 95–CV1500, 1998 WL 178798 (N.D.N.Y. Apr. 10, 1998)(African–American plaintiff who had been detained by shop security personnel failed to state claim of IIED); *Robinson v. Town of Colonie*, 878 F.Supp. 387 (N.D.N.Y.1995)(black plaintiffs who had been forcibly removed from a retail establishment by police failed to state a claim for IIED).

Given the high threshold set by *Martin*, and the results of *Brown* and *Robinson*, I must dismiss the fourth cause of action against all Defendants.

### 5. *Negligent Infliction of Emotional Distress*

■ Plaintiff's fifth claim sounds in negligent infliction of emotional distress. This tort has been recognized in New York only where the plaintiff can establish one of the following: she suffered some physi-

cal trauma or she was caused to fear for her physical safety, *see Mortise v. United States*, 102 F.3d 693–96 (2d Cir.1996); she was within the so-called "zone of danger" when an immediate family member was killed or injured, *see Trombetta v. Conkling*, 82 N.Y.2d 549, 605 N.Y.S.2d 678, 626 N.E.2d 653 (1993); she was wrongly notified of the death of a near relative, *see Johnson v. State*, 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590 (1975); or the mortal remains of a deceased family member were improperly handled, *see Lando v. State*, 39 N.Y.2d 803, 385 N.Y.S.2d 759, 351 N.E.2d 426 (1976). The New York Court of Appeals has cautioned against extending this rule beyond the particular facts of these limited categories of cases. *See Tebbutt v. Virostek*, 65 N.Y.2d 931, 933, 493 N.Y.S.2d 1010, 1011–12, 483 N.E.2d 1142 (1985). Indeed, in *Trombetta*, the Court ruled that the aunt of a decedent who was within the zone of danger when the decedent was killed could not recover for negligent infliction of emotional distress because she was not a member of his "immediate" family. *But see Sullivan v. Ford Motor Co.*, No. 97 Civ. 0593, 2000 WL 343777 (S.D.N.Y. Mar.31, 2000)(aunt who was legal guardian of minor nephew held to be "immediate family member" for purposes of negligent infliction of emotional distress). Thus, the parameters of this tort are extremely narrow.

■ Plaintiff does not allege that she suffered any physical injury at the hands of anyone involved in this matter. No reasonable trier of fact could conclude that any defendant did anything that unreasonably endangered Nevin's physical safety. *See Losquadro v. Winthrop University Hospital*, 216 A.D.2d 533, 534, 628 N.Y.S.2d 770 (2d Dept.1995). None of the other situations in which the tort has been recognized is implicated on the facts before me. Therefore, in light of *Tebbutt*, the claim must be dismissed.

### 6. *Prima Facie Tort*

■ Plaintiff's Sixth Cause of Action alleges a claim for prima facie tort,

another cause of action that is highly disfavored in New York. Among other things, it is well settled that any claim that is covered by a traditional tort cannot be the basis for a claim of prima facie tort—even if the traditional tort claims turn out not to be viable. *See Gertler v. Goodgold,* 107 A.D.2d 481, 487 N.Y.S.2d 565, 572 (1st Dept.), *aff'd on opinion below,* 66 N.Y.2d 946, 498 N.Y.S.2d 779, 489 N.E.2d 748 (1985) ("Prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs."). The pleading in this case, after repeating the plaintiff's factual allegations supporting her claims for defamation (against the Lord & Taylor Defendants) and, intentional or negligent infliction of emotional distress and false imprisonment (against the Citibank and Lord & Taylor Defendants)—all of which are traditional torts—adds the following allegation in an effort to plead prima facie tort: "the aforesaid acts of following, reporting and detaining Plaintiff, which are otherwise lawful, were unlawful because...[they involved] racial profiling and racial discrimination" by the Defendants. (Am. Cplt.¶ 69.) The complaint also alleges, in conclusory fashion, that "such unlawful acts of racial discrimination were intended to cause harm to plaintiff ... and were motivated solely by malice, hate and/or disinterested malevolence." (Am. Cplt.¶ 70.)

Notwithstanding these conclusory statements, Nevin has not alleged a viable prima facie tort against either the Citibank or Lord & Taylor Defendants. The substantive actions she identifies as tortious under the sixth cause of action—"the aforesaid acts of following, reporting and detaining Plaintiff"—are the very same actions that underlie Nevin's various traditional tort claims. The additional allegations, which concern motive, do not suffice to transform those traditional torts into a prima facie tort.

Moreover, Nevin's own allegations demonstrate that the Citibank and Lord &

Taylor Defendants were not motivated solely and exclusively by disinterested malice toward Plaintiff. Rather, in authorizing Bottass to contact the authorities, they were protecting their own financial, business or other self-interested motives. Plaintiff's Amended Complaint alleges that the Citibank defendants were told that "Plaintiff was shopping with a stolen credit card" (Am.Cplt.¶ 22), was behaving suspiciously and was "committing a crime." (Am.Cplt.¶ 23). Since, under Federal law, Citibank was liable for any unauthorized credit card use that exceeds $50 (*see* 15 U.S.C. § 1643), the Citibank defendants were necessarily acting in their own business interest by authorizing the store to contact the authorities. The Lord & Taylor Defendants were likewise acting in their own interest in keeping illegal activity out of their store and preventing any financial losses. It is thus apparent from the face of the Complaint that no action in prima facie tort will lie against Citibank or CCSI. *See Idaho Potato Commission v. M&M Produce Farms & Sales,* 35 F.Supp.2d 313, 324 (S.D.N.Y.1999); *O'Brien v. Alexander,* 898 F.Supp. 162, 174 (S.D.N.Y.1995), *aff'd in pertinent part,* 101 F.3d 1479 (2d Cir.1996). Nevin's conclusory allegation that these defendants acted "maliciously" does not alter this conclusion. *See Supply & Building Co. v. Estee Lauder International, Inc.,* 1999 WL 178783, 1999 U.S. Dist. Lexis 3987 (S.D.N.Y.1999).

### 7. *False Imprisonment*

In her Seventh Cause of Action, Nevin claims that the two Eastchester Police officers detained her at her home on the basis of the false reports disseminated by Bottass, Lord & Taylor and the Citibank Defendants. Such allegations fail to state a claim for false arrest against either the Citibank or Lord & Taylor Defendants as a matter of law. *See King v. Crossland Savings Bank,* 111 F.3d 251, 257 (2d Cir. 1997) (no action for false imprisonment lies against American Express and Crossland

Savings Bank for erroneous report to police that traveler's checks in plaintiff's possession had been stolen). On the record before me, it is clear that the police, having received the report of possible unauthorized credit card activity, conducted their own investigation and reached their own independent conclusions (discussed below). They were acting in response to a report, true, but no one was forcing them to act. Indeed, the police are under no independent duty to act in response to private complaints—they acted of their own volition. As a matter of law, this does not qualify as "causing or directing an arrest of imprisonment" or "taking an active part in the arrest and procuring it to be made," which is the gravamen of a claim of false imprisonment against a private citizen who does not actually detain anyone. *See Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir.1998).

 8. *N.Y. Civil Rights Act § 40; N.Y. Executive Law § 296, 2(a); 42 U.S.C. § 2000(a)*

These claims allege that Citibank and CCSI, Lord & Taylor, May Company and Bottass violated two separate sections of New York law, each of which provides for civil liability against the "owner, manager, superintendent, agent or employee" of any "place of public accommodation" who denies any person the full use of such place of public accommodation on account of race, N.Y. Exec. L. § 296(2)(a), N.Y. Civil Rights L. § 40, and their federal analogue, 42 U.S.C. § 2000(a). The full use of a place of public accommodation includes "the extension of credit." N.Y. Exec. L. § 296(2)(a).

 Lord & Taylor is a retail store falling within the definition of a public accommodation. *See* N.Y. Exec. L. § 292(9). However, the Lord & Taylor

Defendants cannot be liable under these provisions because Plaintiff was at no time denied access to the store, service in the store, extension of credit while in the store or any other amenities that the store offers its customers. Nevin does not allege that she had any problems at Lord & Taylor. Thus, Plaintiff fails to state a claim for denial of public accommodation against the Lord & Taylor Defendants.

 Nor does Plaintiff state a claim against the Citibank Defendants for the activities of anything that took place at Lord & Taylor. Neither Citibank nor CCSI is an owner or manager of Lord & Taylor. However, Plaintiff alleges in her complaint that Citibank and/or CCSI is the owner and/or manager of a public accommodation as defined under the New York Executive Law, and that the denial of her credit card at Charisma violated her access to that accommodation.

It is manifest that providing credit card services is not a "place of public accommodation" in any literal sense, and is, indeed, not a "place" at all. New York courts, however, have interpreted the public accommodations statute liberally, and have found many institutions and businesses that hold themselves open to public access to be public accommodations. *See, e.g., Cahill v. State Div. of Human Rights*, 89 N.Y.2d 14, 651 N.Y.S.2d 344, 674 N.E.2d 274 (1996)(holding that private dental offices are "places of public accommodations."); *New York Roadrunners Club v. State Div. of Human Rights*, 55 N.Y.2d 122, 447 N.Y.S.2d 908, 432 N.E.2d 780 (1982)(holding that the New York Marathon is a public accommodation); *U.S. Power Squadrons v. State Human Rights Appeal Bd.*, 59 N.Y.2d 401, 465 N.Y.S.2d 871, 452 N.E.2d 1199 (1983)(holding boating organization to be public accommodation).[9]

9. That New York courts have yet to address the issue of whether the business that is exchanged during a private credit card transaction is a "place of public accommodation" is hardly surprising, given that discriminatory

consumer credit practices are prohibited under federal law. *See* The Equal Credit Opportunity Act, 15 U.S.C. § 1691 (making it unlawful to discriminate against any applicant with respect to any aspect of a credit transac-

I need not determine whether Citibank/CCSI is a public accommodation within the meaning of the state or federal statutes, however, because I find that no rational trier of fact could conclude that Citibank and CCSI made the decision to place a block on Nevin's card because she was black. Nor do I find any evidence that Citibank authorized Lord & Taylor to report its suspicions to the Eastchester police because Plaintiff was black. All that Plaintiff alleges is that Bottass told Citibank that the card was being used by a "black" person. This statement, however, was part of his overall physical description of Plaintiff, a description which included her age and her gender. Plaintiff fails to allege, must less adduce evidence, that Lord & Taylor's report to Citibank/CCSI was any different from a report they would make about a white person, or that Citibank/CCSI treated Lord & Taylor's report about Plaintiff differently than it would treat a report of suspicious credit card activity involving a white person. *See Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir.1994).

Plaintiff's own admission that her conduct that day might well be viewed as suspicious, coupled with Citibank's legal responsibility for fraudulent charges and Lord & Taylor's interest in preventing losses in its store, compels dismissal of these claims.

9. *Violations of 42 U.S.C. § 1981; United States and New York Constitutional Claims*

In her eleventh cause of action, Plaintiff asserts claims against the Citibank and Lord & Taylor Defendants for violation of her constitutional rights under 42 U.S.C. § 1981.[10] To state a Section 1981 claim, a plaintiff must show (1) that defendant intended to discriminate on the

basis of race, and (2) that the discrimination concerned the making and enforcing of contracts. *See Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993). The key issue in examining a Section 1981 claim is "whether 'plaintiffs assembled specific facts adequate to show or raise a plausible inference that they were subjected to race-based discrimination.'" *Brown v. City of Oneonta*, 858 F.Supp. 340, 344 (N.D.N.Y.1994)(quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 17 (1st Cir.1989)).

For the reasons stated above, I find that Plaintiff has failed to raise any issue of material fact that either Lord & Taylor or Citibank/CCSI was motivated by discriminatory intent. Further, Plaintiff fails to provide any factual support that she was deprived of any right to "make and enforce contracts." Plaintiff purchased everything she desired at both the Lord & Taylor and Charisma stores. And if the gravamen of Plaintiff's § 1981 claim is Citibank's refusal to honor her Visa card at Charisma, I am constrained to note that Nevin was the cause of her own distress. Plaintiff was asked to come to the phone and speak to a CCSI representative while she was shopping at Charisma. Although the exact chronology of phone calls between Bottass, Citibank/CCSI and the Nevin household is unclear, had Nevin spoken with CCSI while at Charisma, she could have cleared up the problem created by Bottass' erroneous suspicions then and there.

Plaintiff also alleges a violation of the New York State Constitution, Article I Section 11, which prohibits discrimination and the "denial of equal protection of the laws of the state." Plaintiff does not identify what state law's protection she was denied or how the Lord & Taylor and

---

tion on the basis of race, color, religion, national origin sex or marital status).

**10.** Section 1981 provides in pertinent part that "[a]ll persons ... shall have the same rights ... to make and enforce contracts

...and to full and equal benefits of all laws ... for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981.

Citibank Defendants—private parties all—deprived her of the protection of that law. And, as noted above, Nevin has failed to raise any inference of discrimination based on race. Her State constitutional claim is also dismissed.

10. *Respondeat Superior*

In her first through seventh causes of action, Plaintiff has pleaded her tort claims directly against Citibank/CCSI and Lord & Taylor and May Company (the corporations). In her eighth cause of action, Plaintiff alleges that these corporations are liable on a theory of *respondeat superior.* Of course, a corporation can only act through an individual, so if the claims are insufficient on a direct basis, they are no more sufficient on a derivative basis. This claim, too, is dismissed.

D. *Eastchester Defendants' Motion to Dismiss*

1. *The Allegations*

Plaintiff alleges the following claims against the Town of Eastchester and Officers Mignone and Denning: deprivation of her civil rights under the federal and state constitutions and 42 U.S.C. § 1981 (eleventh cause of action); *respondeat superior* liability (eighth cause of action); intentional and negligent infliction of emotional distress (fourth and fifth causes of action); prima facie tort (sixth cause of action); and false imprisonment (seventh cause of action). The Eastchester Defendants served and filed an answer to the complaint on February 4, 2000.

2. *Civil Rights Claims Against the Officers*

The principal Eastchester Defendants are Officer Mignone and Denning. The facts concerning their conduct are undis-

puted: they received a report of a possible stolen credit card, they proceeded to the home of the suspect, they interviewed the suspect on her front porch, they quickly concluded that no crime had been committed, and they left the premises. Their encounter with Plaintiff took no more than 10–15 minutes. They have been accused of violating Plaintiff's civil rights.[11] The question is whether, on these facts, the officers are entitled to qualified immunity as a matter of law.

■■■■■■ Police officers enjoy qualified immunity from all civil liability in connection with their performance of investigative acts. *See Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987). In determining whether an officer enjoys qualified immunity, the trier of fact must determine whether it was objectively reasonable for the officer to engage in the investigative act in question. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The United States Supreme Court has indicated that use of this standard should allow many cases to be resolved by a court on motions for summary judgment. *See Id.*

■■■■ This is such a case. The allegations of the complaint allege no more than that the officers received a report of a possible crime and investigated that report. That the report turned out to be unfounded does not mean that the officers should have—or could have—ignored it. Certainly no citizen, of whatever color, has a constitutional right to be immune from investigation when the police receive a report that criminal activity may have taken place. Forestalling suits like this one is the reason why the law shields police officers with qualified immunity—so that the police can investigate all reports of criminal activity, without fear that doing so in

---

**11.** Plaintiff brought her eleventh cause of action for deprivation of her state and constitutional rights under 42 U.S.C. § 1981. As noted above, Plaintiff fails to state a claim under Section 1981. Moreover, Plaintiff's claim for violation of her constitutional rights, is a civil action for deprivation of rights under color of law, which is properly pled pursuant to 42 U.S.C. § 1983. See *Turpin v. Mailet,* 591 F.2d 426, 427 (2d Cir.1979). I thus apply Section 1983 analysis to her claims against the police officers and the Town.

cases where it turns out that no crime was committed, or that the suspect is not the perpetrator, will subject them to liability.

Plaintiff has pointed to no evidence—either in her § 50–h examination, her complaint or her response to the officers' motion—from which a reasonable trier of fact could conclude that the Defendant officers would not have gone to Plaintiff's home if she were white, or that they were motivated by racial considerations in either the fact or the manner of their investigation. Thus, this case falls squarely within the rule announced in *Robinson v. Town of Colonie*, 878 F.Supp. 387 (N.D.N.Y.1995), where local police officers asked African–American plaintiffs to leave a store after being accused of shoplifting by the store's management. The district court granted summary judgment because the plaintiffs "failed to establish that a factual issue exists with respect to whether the officers' actions were motivated, even in part, by a discriminatory animus, an element upon which the plaintiffs bear the burden... the record is devoid of any evidence from which a reasonable trier of fact could find that the officers' actions toward plaintiffs were motivated by such animus." *Id.*, at 404. So too here.

### 3. Civil Rights Claims Against the Town

■ As to the Town itself, this Federal claim must also be dismissed. Because Plaintiff has not identified any unconstitutional policy, custom or practice of the Town that deprived her of her civil rights, Eastchester is entitled to dismissal under *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Alleging a single incident of allegedly unconstitutional activity, perpetrated by one who is not a final policymaker for the Police Department (which Officers Mignone and Denning are not) is insufficient to make out an unconstitutional municipal policy, custom or practice. *See Covington v. City of New York*, 916 F.Supp. 282, 289 (S.D.N.Y.1996); *Ric-*

*ciuti v. New York City Transit Authority*, 941 F.2d 119, 122–23 (2d Cir.1991).

■ In an effort to plead a constitutional violation against the Town, Nevin alleges, in the most general terms, that the Town failed properly to train or supervise its officers. However, no rational trier of fact could conclude that the facts of this case make out the sort of "deliberate indifference to constitutional rights" that must underlie a successful failure to train or supervise case. *See Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir.1992). All that happened here was that the local police department received a report of possible criminal activity that turned out to be unfounded. The police investigated the report and, concluding that there had been no crime, took no action. A citizen has no constitutional right not to be questioned by the police when the police are acting in response to a report of possible criminal activity. Therefore, no claim of failure to train and supervise will lie. Indeed, this case exemplifies where training and supervision of police officers pays off: the police, doing what they are paid to do, quickly concluded that the crime report was unfounded and closed the case without taking any action against Plaintiff. While Plaintiff's anger at Bottass and Lord & Taylor for making the unfounded report is understandable, she has allowed that anger spill over against the Town and the officers, who did absolutely nothing wrong.

The eleventh cause of action against the Eastchester Defendants is dismissed.

### 3. Respondeat Superior

It is well settled that no claim lies against a municipality on a respondeat superior theory. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Therefore, the eighth cause of action is dismissed against the Town of Eastchester.

### 4. Tort Claims Against the Eastchester Defendants

The remaining claims against the Eastchester defendants arise under State law.

For the reasons stated above, Plaintiff has failed to state a claim for intentional or negligent infliction of emotional distress or prima facie tort against any defendant, and those claims are dismissed. It is necessary only to address separately the claim for false imprisonment, since it is directed against Officers Mignone and Denning.

 The false imprisonment claim requires four elements: (1) the defendant must have an intent to confine the plaintiff; (2) the plaintiff must have been conscious of the confinement; (3) the plaintiff must not have consented to the confinement; and (4) the confinement must not have been privileged. *See Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 (1975) *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). The claim here must be dismissed because no reasonable trier of fact could conclude that Plaintiff was ever confined. She was questioned outside her home. She was not touched during the encounter. She was not told that she was not free to leave, and she did not ask the officers to leave her property. This evidence simply does not admit of any inference that Plaintiff was "confined" in any legal sense during the relatively brief period when she was being questioned. Moreover, as the officers were privileged to investigate a report of possible criminal activity, to the extent that Plaintiff felt "confined" during her questioning, that "confinement" would be privileged. *See id.*

As there was no violation of Plaintiff's constitutional rights by the officers in this case, there is no basis on which to hold the Town liable for false arrest pursuant to 42 U.S.C § 1983.

### III. CONCLUSION

For the reasons set forth above, the motions of the Citibank Defendants and the Eastchester Defendants are granted and the complaint is dismissed as against them with prejudice.

This constitutes the decision and order of this Court.